MICHIGAN CANNERS AND FREEZERS ASSOCIATION, INC v
AGRICULTURAL MARKETING AND BARGAINING BOARD
(AFTER REMAND)

Docket No. 56434. Argued October 10, 1975 (Calendar No. 6). Origi-
nally decided August 25, 1976. Reargued after remand June 4,
1981 (Calendar No. 10).—Decided December 23, 1982.

The Agricultural Marketing and Bargaining Board accredited the
Michigan Asparagus Growers Division of the Michigan Agricul-
tural Cooperative Marketing Association, Inc., as the sole sales
and bargaining representative of the Processing Asparagus
Bargaining Unit over the objection of the Michigan Canners
and Freezers Association, Inc. Michigan Canners, individual
members of the association, Dukesherer Farms, Inc., and Ferris
Pierson brought an action in the Ingham Circuit Court against
the board and the cooperative association, seeking review of the
decision under the Administrative Procedures Act and an
injunction and declaratory judgment on the constitutionality
and construction of the Agricultural Marketing and Bargaining
Act. The circuit court, Thomas L. Brown, J., dismissed the
complaint, ruling that the Court of Appeals has jurisdiction to
review all board action, and declining to examine the constitu-
tionality of the act. The Court of Appeals, Danhof, P.J., and
J. H. Gillis and Quinn, JJ., denied leave to appeal (Docket Nos.
20309, 20310). The Supreme Court remanded the case to the
circuit court for development of a record sufficient to permit
consideration of the plaintiffs' challenge to the constitutionality
of the Agricultural Marketing and Bargaining Act and determi-
nation of the applicability of the Administrative Procedures
Act. After remand, the plaintiffs challenge the marketing act
on three constitutional grounds: the act conflicts with and is
pre-empted by the Federal Agricultural Fair Practices Act of
1967; the act is facially unconstitutional because it exceeds the

REFERENCES FOR POINTS IN HEADNOTES
[1-3] 3 Am Jur 2d, Agriculture § 53.
   16 Am Jur 2d, Constitutional Law § 291.
   18 Am Jur 2d, Cooperative Associations § 21 *et seq.*
   52 Am Jur 2d, Markets and Marketing § 19.
[4, 5] 2 Am Jur 2d, Administrative Law §§ 202, 204.

state's police power; and the provisions of the act exceed the scope of its title in violation of the Michigan Constitution. In addition, the plaintiffs contend that the Administrative Procedures Act is applicable to the marketing act and that the board failed to comply with it in accepting and accrediting Asparagus Growers Division as the bargaining representative of the Processing Asparagus Bargaining Unit.

In an opinion by Justice Ryan, joined by Chief Justice Fitzgerald and Justices Kavanagh, Williams, Levin, and Coleman, the Supreme Court *held:*

The Agricultural Marketing and Bargaining Act is not pre-empted by the Federal Agricultural Fair Practices Act and is constitutional on its face, and its provisions do not exceed the scope of its title. Accreditation proceedings under the marketing act are contested cases within the meaning of the Administrative Procedures Act and, thus, are subject to its procedural safeguards.

1. Federal legislation may pre-empt state legislation where the state seeks to regulate an area which Congress has intended to occupy completely, whether the state legislation is in harmony or in conflict with the federal legislation; or where the area regulated has not been fully foreclosed to state regulation by Congress, but the state regulation conflicts with the federal regulation. In the latter case, a conflict will be found where compliance with both federal and state regulations is a physical impossibility or where the state regulation stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

2. Congress has not foreclosed state regulation of agricultural marketing. The federal act and the state act in this case each seek to accomplish the same general purpose—to permit producers to associate together in a marketing cooperative to improve their marketing and bargaining position when dealing with processors. The primary distinction between the regulatory schemes is the requirement of the state act that once an association of producers is certified by the board that association becomes the exclusive sales representative for all producers in the bargaining unit, whether they are members of the association or not. Before an association becomes an exclusive representative, a majority of the producers who produce a majority of the commodity involved must vote for such representation. The federal act lacks any such exclusivity provision, but instead specifically disavows such regulation. This disavowal does not affirmatively create or protect rights of private dealing between individual producers and processors, however.

Rather than having an operative effect, it is essentially explanatory. It neither requires nor prevents bargaining between processors and individual producers or associations of producers. It is simply a statement indicating that the federal act did not promulgate an exclusive bargaining system of marketing; it does not forbid a state from requiring exclusive representation. Thus, the state act does not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. It is a step into an unregulated area which furthers the goals of the federal act. Nor is it physically impossible to comply with both acts. The additional provisions of the state act apply only to producers, an area not regulated under the federal act.

3. The Agricultural Marketing and Bargaining Act is an enabling act which seeks solely to promote the equalization of bargaining power between producers and processors of perishable commodities. It is a legitimate exercise of the state's police power in that it addresses the public purpose of equalizing bargaining power between a small number of processors and a large number of producers, eliminating the potential for price-setting by the processors and the potential for disruption of the marketing of perishable agricultural products, and its provisions enabling producers to bargain collectively, protecting producer associations from being weakened through sweetheart deals and free-riders, and requiring compulsory arbitration for resolving impasses are rationally related to that public purpose.

4. The substantive provisions of the Agricultural Marketing and Bargaining Act do not exceed the scope of its title. The title of an act need not serve as an index; it is sufficient if it fairly expresses the subject of the legislation and conveys comprehension of its germane provisions. The title of the marketing act, as it stands, fairly expresses the subject of the legislation and conveys comprehension of its germane provisions. The title-object provision of the constitution must be construed reasonably and not in so narrow and technical a sense as unnecessarily to embarrass legislation.

5. The Administrative Procedures Act provides that a contested case is a proceeding in which a determination of the legal rights, duties, or privileges of a named party is required by law to be made by an agency after an opportunity for an evidentiary hearing. Association accreditation proceedings under the marketing act are such contested cases. The Agricultural Marketing and Bargaining Board is an agency. Proceedings before the board involve determination of the duties, rights, and privileges of a named party—an association of

producers. The board's determination may be made only after an evidentiary hearing. The Legislature did not intend, in adopting the marketing act, to foreclose application of the APA to accreditation proceedings. The failure to refer to the APA in the marketing act provisions relative to accreditation proceedings while making specific references to it in three other provisions does not compel the conclusion that the APA does not apply to accreditation proceedings. The APA defines its own applicability and is not dependent upon express legislative invocation. Absent express exclusion, the applicability of the APA is governed by a determination whether the agency action falls within its purview. Challenges to final orders of the agency are within the original jurisdiction of the Court of Appeals.

1. AGRICULTURE — CONSTITUTIONAL LAW — MARKETING — REGULA-
   TION — FEDERAL PRE-EMPTION.

   The state Agricultural Marketing and Bargaining Act is not pre-empted by the Federal Agricultural Fair Practices Act; Congress has not foreclosed state regulation of agricultural marketing, the state regulation does not conflict with the federal, and it is not physically impossible to comply with both acts; each act seeks to permit producers to associate in marketing cooperatives to improve their marketing and bargaining position when dealing with processors, and the state act, in requiring exclusive representation for producers, does not obstruct congressional objectives, but steps into an unregulated area which furthers the goals of the federal act (US Const, art VI; 7 USC 2301 *et seq.;* MCL 290.701 *et seq.;* MSA 12.94[101] *et seq.).*

2. AGRICULTURE — CONSTITUTIONAL LAW — MARKETING — REGULA-
   TION.

   The Agricultural Marketing and Bargaining Act is constitutional on its face; it is a legitimate exercise of the state's police power, addressing the public purpose of equalizing bargaining power between processors and producers and eliminating the potential for price-setting and disruption of the marketing of perishable agricultural products, and its provisions to enable bargaining, to protect producer associations from being weakened, and to require compulsory arbitration to resolve impasses are rationally related to its public purpose (MCL 290.701 *et seq.;* MSA 12.94[101] *et seq.).*

3. AGRICULTURE — CONSTITUTIONAL LAW — MARKETING — REGULA-
   TION.

   The substantive provisions of the Agricultural Marketing and

Bargaining Act do not exceed the scope of its title; the title fairly expresses the subject of the legislation and conveys comprehension of its germane provisions (Const 1963, art 4, § 24; MCL 290.701 *et seq.;* MSA 12.94[101] *et seq.).*

4. AGRICULTURE — MARKETING — ACCREDITATION — ADMINISTRATIVE LAW.

The Agricultural Marketing and Bargaining Board is an agency and accreditation proceedings under the Agricultural Marketing and Bargaining Act are contested cases within the meaning of the Administrative Procedures Act and, thus, are subject to its procedural safeguards (MCL 24.203, 290.707-290.710; MSA 3.560[103], 12.94[107]-12.94[110]).

5. ADMINISTRATIVE LAW — ADMINISTRATIVE PROCEDURES ACT — APPLICABILITY.

The Administrative Procedures Act defines its own applicability and is not dependent upon express legislative invocation; absent express exclusion, its applicability is governed by whether an agency action falls within its purview (MCL 24.201 *et seq.;* MSA 3.560[101] *et seq.).*

*Warner, Norcross & Judd* (by *Ernest M. Sharpe* and *Joseph G. Scoville; Barrie Lawson Loeks,* of counsel) for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Charles D. Hackney* and *Henry J. Boynton,* Assistants Attorney General, for the Agricultural Marketing and Bargaining Board.

*Foster, Swift, Collins & Coey, P.C.* (by *James A. White, Michael J. Schmedlen,* and *William K. Fahey),* for the Michigan Agricultural Cooperative Marketing Association, Inc.

RYAN, J. This is the second time this litigation has been before the Court.

In 1976, an opinion and supporting orders were issued remanding the case to the circuit court for the development of a record sufficient to permit consideration of the plaintiffs' original challenge to the constitutionality of the Agricultural Marketing and Bargaining Act, MCL 290.701 *et seq.;* MSA 12.94(101) *et seq.* (hereinafter the AMABA or the Michigan act), and determination of the applicability of the Administrative Procedures Act, MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.*[1] The somewhat unique procedural history detailed · in the 1976 opinion brought the case before the Court without the development of a factual record necessary for resolution of some of the substantive challenges then presented. We retained jurisdiction, and the parties, having complied with our prior orders, are before the Court once again.

Plaintiffs include Michigan Canners and Freezers Association, an organization of "handlers"[2] of "agricultural commodities",[3] individual handlers,

[1] See *Michigan Canners & Freezers Ass'n, Inc v Agricultural Marketing & Bargaining Board,* 397 Mich 337; 245 NW2d 1 (1976).

[2] MCL 290.702(g); MSA 12.94(102)(g).

"(g) 'Handler' means a person other than an association engaged in the business or practice of acquiring agricultural commodities from producers or associations for processing or sale; grading, packaging, handling, storing or processing agricultural commodities received from producers or associations; contracting or negotiating contracts or other arrangements, written or oral, with producers or associations with respect to the production of any agricultural commodity; or acting as an agent or broker for a handler in the performance of any function or act specified above. It does not include a producer who sells at a retail establishment which he owns and operates or who sells directly to consumers at a produce market, agricultural commodities produced by him and agricultural commodities produced by another producer subject to value limitation established by the board."

[3] MCL 290.702(f); MSA 12.94(102)(f).

"(f) 'Agricultural commodity' means all perishable fruits and vegetables as defined by the board. The kinds, types and subtypes of products to be classed together as an agricultural commodity for the purposes of this act shall be determined by the board on the basis of common usage and practice."

an incorporated "producer",[4] and an individual "producer". They have challenged AMABA on three constitutional grounds:

1) The Michigan act conflicts with and is, therefore, pre-empted by the Federal Agricultural Fair Practices Act of 1967, 7 USC 2301 *et seq.* (hereinafter FAFPA or the federal act);

2) The Michigan act is facially unconstitutional because it exceeds the state's police power; and

3) The Michigan act's provisions exceed the scope of its title in violation of the Michigan Constitution.[5]

In addition, plaintiffs contend that the Administrative Procedures Act of 1969, MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.* (hereinafter the APA), is applicable to AMABA and that the defendant Agricultural Marketing and Bargaining Board failed to comply with the requirements of the APA in accepting and accrediting the Michigan Asparagus Growers Division of defendant Michigan Agricultural Cooperative Marketing Association (MACMA) as the bargaining representative of the Processing Asparagus Bargaining Unit. We address the issues in the order raised.

## I

The United States Congress and the Michigan

---

[4] MCL 290.702(e); MSA 12.94(102)(e).

"(e) 'Producer' means any person who produces or causes to be produced in any 1 marketing period within the previous 2 marketing periods, any agricultural commodity in quantity beyond his own family use and having a minimum value at first point of sale as determined by the board for that agricultural commodity, and who is able to, during the marketing period transfer to a handler or an association a merchantable title to the agricultural commodity or provide management, labor, machinery, facilities or any other production input, with the assumption of risk, for the production of the agricultural commodity under a written or oral contract."

[5] "No law shall embrace more than one object, which shall be expressed in its title." Const 1963, art 4, § 24.

Legislature have each passed legislation to protect a farmer's right to join a cooperative association and to bargain collectively through that association. It is not disputed that FAFPA and AMABA share at least this one common goal. Nevertheless, plaintiffs argue that the scheme chosen by the Michigan Legislature to carry out that purpose conflicts totally with that chosen by Congress and thus, pursuant to the supremacy clause contained in art VI of the United States Constitution,[6] the Michigan legislation is "pre-empted".

In interpreting and applying the supremacy clause in the context of competing state and federal legislation, the United States Supreme Court has developed two lines of analysis to describe situations in which federal legislation has pre-empted state lawmaking on the subject in question.

The first is so-called "field pre-emption" in which any state legislation, harmonious or otherwise, is invalid if it seeks to regulate in any area in which Congress has intended to completely occupy the field. See *Rice v Santa Fe Elevator Corp,* 331 US 218; 67 S Ct 1146; 91 L Ed 1447 (1947).

The second type of pre-emption is called "conflict pre-emption" and exists in circumstances in which a state regulation is invalid under the supremacy clause, even though Congress has not fully foreclosed state legislation in a particular area, because the state regulation is held to be in conflict

---

[6] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding." US Const, art VI.

with the federal regulation. The two-prong test to determine if a conflict pre-emption exists was most clearly articulated in *Ray v Atlantic Richfield Co,* 435 US 151, 158; 98 S Ct 988; 55 L Ed 2d 179 (1978):

"A conflict will be found 'where compliance with both federal and state regulations is a physical impossibility' * * * or where the state 'law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"

The parties agree that this is not a case of field pre-emption since the federal act itself, § 2305(d), states that "existing State law" shall not be changed or modified by the federal act. Thus, it is clear that Congress did not intend to foreclose state regulation of agricultural marketing. We note, however, that § 2305(d) is not enough in itself to resolve the dispute in defendants' favor, since the Michigan act was not passed by the Legislature until 1972, four years after the federal act.

Instead, plaintiffs have framed their challenge to the AMABA in conflict pre-emption terms, asserting both that AMABA stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and that "compliance with both federal and state regulations is a physical impossibility". We disagree.

### A

Concededly, the FAFPA and the AMABA seek to accomplish the same *general* purpose: to permit producers (farmers) to associate together in a marketing cooperative to enable them to improve their marketing and bargaining position when dealing

with food handlers (processors).[7] The primary dis-- tinction between the two regulatory schemes is AMABA's requirement that once an association of producers is accredited by the Agricultural Marketing and Bargaining Board,[8] that association becomes the exclusive sales representative for all producers in the bargaining unit, regardless of membership in the association.[9] Those producers in the bargaining unit who do not join the association are, nevertheless, bound, when dealing separately and individually with a handler, by all terms and conditions of the contract negotiated with handlers and must assist in supporting the association by paying a service fee.[10] Even an association member who chooses to deal with a handler individually, as indeed he may, is likewise bound by the terms of the association's bargain with a handler of the same commodity.

Once an association is accredited, AMABA makes it unlawful for handlers "[t]o refuse to bargain with an accredited association with whom the handler has had prior dealings or with an accredited association whose producers in the bargaining units have had substantial dealing with the handler prior to the accreditation of the association", or "[t]o negotiate with a producer included in the bargaining unit after an association is accredited."[11]

A prerequisite to accreditation is that the association seeking accreditation must have "marketing

---

[7] For ease of reference, we use the terms handler and processor interchangeably in this opinion although, in a way not germane to our disposition of the issues, there is a technical difference between the two.

[8] The board is created by the act. See MCL 290.703; MSA 12.94(103).

[9] MCL 290.710, 290.713; MSA 12.94(110), 12.94(113).

[10] MCL 290.710(1); MSA 12.94(110)(1).

[11] MCL 290.704(1), subds (g), (h); MSA 12.94(104)(1), subds (g), (h).

and bargaining contracts for the current or next marketing period with more than 50% of the producers of an agricultural commodity who are in the bargaining unit and these contracts cover more than 50% of the quantity of that commodity produced by producers in the bargaining unit".[12] Put differently, before an association becomes the exclusive sales representative of all producers, there must not only be a majority of such producers in favor of, and voting for, such representation, but those producers must also produce a majority of the quantity of the commodity involved.

In contrast to AMABA, FAFPA lacks any such exclusive representation provisions. Instead, FAFPA specifically disavows any attempt to regulate in such a manner:

"Disclaimer of intention to prohibit normal dealing

"Nothing in this chapter [7 USC 2301 *et seq.]* shall prevent handlers and producers from selecting their customers and suppliers for any reason other than a producer's membership in or contract with an association of producers, nor require a handler to deal with an association of producers." 7 USC 2304.

Plaintiffs claim that this provision should be read either as the affirmative creation of a *processor's* right to deal with the individual farmer of his choice, or the affirmative protection of such a right. It is, in plaintiffs' view, a provision representing a careful balance struck by Congress only after consideration of the conflicting interests of individual producers, processors, and associations. Citing *Jones v Rath Packing Co,* 430 US 519; 97 S Ct 1305; 51 L Ed 2d 604 (1977), plaintiffs argue that despite the fact that the Michigan and federal acts share a common general purpose, the method

_____

[12] MCL 290.707(c); MSA 12.94(107)(c).

of regulation chosen by Michigan upsets "the balance struck by Congress" and AMABA must, therefore, fall.

Were we to agree that § 2304, or any provision in FAFPA, was meant to affirmatively *create* or *protect* rights of private dealing between individual producers and processors, we would agree that AMABA must fall because, plainly, AMABA conflicts with that result. However, we do not find such meaning in the provisions of the federal act.

The language of § 2304 does not justify the meaning plaintiffs assign to it. The disclaimer provision, rather than having an operative effect, is essentially explanatory, beginning as it does with the phrase "[n]othing in this chapter", referring to the substantive and affirmative provisions of FAFPA. It neither requires nor prevents bargaining between handlers and individual producers or associations of producers. We do not discern from a provision termed a "disclaimer of intention" a positive congressional intent to prohibit the conduct said not to be regulated. There is no logical nexus between a provision declaring "this is what we did not do" and the conclusion that "what we did not do, cannot therefore be done". Section 2304 is nothing more than an explanation of what FAFPA was not intended to do. It did not, in disclaiming any "intention to prohibit normal dealing", thereby create or affirmatively protect an individual handler's right to bargain with any producer, or an individual producer's right to bargain for himself. It is simply, aside from the disclaimer, neutral on *that* point. Section 2304 cannot fairly be read as a statement of congressional intent to prohibit exclusive bargaining by producer associations. It is simply a statement indicating that *FAFPA* did not promulgate an

exclusive bargaining system for marketing a producer's agricultural commodity.

This interpretation of § 2304 is bolstered as well by the announced congressional finding and declaration of policy contained in § 2301:

> "Agricultural products are produced in the United States by many individual farmers and ranchers scattered throughout the various States of the Nation. Such products in fresh or processed form move in large part in the channels of interstate and foreign commerce, and such products which do not move in these channels directly burden or affect interstate commerce. The efficient production and marketing of agricultural products by farmers and ranchers is of vital concern to their welfare and to the general economy of the Nation. Because agricultural products are produced by numerous individual farmers, the marketing and bargaining position of individual farmers will be adversely affected unless they are free to join together voluntarily in cooperative organizations as authorized by law. Interference with this right is contrary to the public interest and adversely affects the free and orderly flow of goods in interstate and foreign commerce.
>
> "It is, therefore, declared to be the policy of Congress and the purpose of this chapter to establish standards of fair practices required of handlers in their dealings in agricultural products."

Nothing in this broadly drawn provision suggests a congressional intent to affirmatively *protect* producers from exclusive representation or to affirmatively grant new or protect pre-existing rights to deal freely. Instead, the above-quoted language simply demonstrates a congressional intent to protect producers from handler coercion.

Section 2303, which specifically details the practices prohibited, begins:

> "It shall be unlawful *for any handler* knowingly to

engage or permit [engagement] * * * in the following practices:

"(a) To coerce any producer in the exercise of his right to join and belong to or to refrain from joining or belonging to an association of producers, or to refuse to deal with any producer because of the exercise of his right to join and belong to such an association; or

"(b) To discriminate against any producer with respect to price, quantity, quality, or other terms of purchase, acquisition, or other handling of agricultural products because of his membership in or contract with an association of producers". (Emphasis added.)

FAFPA's prohibitions are specifically directed toward regulating *handler* misconduct. Subsection (a) does not afford an absolute right to a producer to deal directly with a handler. It merely protects a producer from being unduly influenced *by a handler* in deciding whether or not to join a cooperative marketing association. While § 2303 makes it unlawful for a handler to coerce a producer to "join and belong to" an association, it does not forbid a *state* from requiring exclusive representation of individual producers where a producer majority sees fit.[13]

All FAFPA meant to accomplish was to restrain certain types of coercive handler conduct. While

[13] The parties have argued at length over whether there is any meaningful distinction between being required to· *join* an association and merely being required to support and be represented by an association as required by AMABA. Analogies are drawn from the field of labor law and the development of the legal consequences of "agency" versus "union" shop contract clauses.

Though we believe there is such a distinction, see *Abood v Detroit Board of Education,* 431 US 209; 97 S Ct 1782; 52 L Ed 2d 261 (1977), its relevance in the pre-emption contest is lacking. The aim of FAFPA is to prevent *handler* coercion. It does not speak to producer protection from all sources of coercion. Even if AMABA were read to require a producer to *join* an association, the coercion would be the product of state action not handler action. Though there undoubtedly would be First Amendment implications, under such circumstances there would still be no conflict between FAFPA and AMABA.

§ 2303 details the prohibitions, § 2304 makes clear, by way of explanation, the limited scope of those prohibitions. Nowhere in FAFPA is there an attempt to protect or create a positive right to deal with whomever a handler or producer wishes.

Our interpretation of FAFPA in general, and § 2304 in particular, is amply supported by the legislative history of the act. The report of the Secretary of Agriculture to the Senate Committee on Agriculture and Forestry in recommending passage of FAFPA states:

"Cooperative action in agricultural production and marketing is increasing. It is growing in response to the need, (1) to achieve more orderliness and efficiency in production and marketing, and (2) to protect and improve bargaining relationships between producers and marketing firms in the face of major changes taking place in the marketing system.

"These changes include the growing integration of production and marketing of agricultural products, the increased control of these functions by large, diversified corporations, and the expanded use of contracting by such corporations to meet their needs. Developments such as these weaken the marketing and bargaining position of individual producers.

"It is essential to protect the rights of producers to join together in cooperatives to perform necessary marketing operations, including bargaining with processors and other buyers over the terms of sale of the producers' farm products. Cooperative bargaining has come into prominence as the old market system is being displaced by contractual arrangements in the production and marketing of agricultural products. We believe these trends will continue.

"The proposed bill would materially strengthen farmers' ability to bargain and market effectively. It will reaffirm the right of producers to join together and operate cooperatives without interference. It will remove some of the impediments confronting producers in organizing and operating their cooperative associations.

"Producers have suffered harassment and reprisal by some processors because of activity in organizing and joining a cooperative. Grower contracts have been canceled or reduced in volume. Processors have offered inducements to growers not to join a cooperative. Attempts have been made to buy off the cooperative's leaders to create dissention in the organization.

"Processors operating in several production areas have coerced growers desiring to form a bargaining cooperative by threatening to leave the cooperative's territory and expand operations elsewhere. Growers have failed to get redress after such questionable processor actions.

"If this bill were enacted, many producers who fear harassment or discrimination would feel free to join a cooperative association. It would help producers use cooperatives as a more effective tool in marketing their products." 1968 US Code Cong & Ad News, p 1875.

Clearly, in the secretary's view, the FAFPA was aimed at enhancing producer bargaining power, not at creating or protecting rights to deal individually.

That intent is reflected as well in the committee report on § 2304:

"Section 5 [§ 2304] disclaims any intent to prevent handlers and producers from selecting their customers and suppliers for any reason other than a producer's membership in an association of producers, or to prevent handlers and producers from dealing with one another individually on a direct basis, or to require a handler to deal with an association of producers. The bill does not prevent or require these actions and is not intended to do so. While the proponents of the bill stated in their testimony that this was not the purpose, there was some concern, especially on the part of processors and other purchasers of agricultural products, that the bill in fact went further than intended. The committee felt that a clear statement in the bill itself would be helpful to courts, handlers, associations,

producers, and others in their construction of this legislation; and has recommended inclusion of this section in the bill.

"There are many good, sound economic reasons for handlers and producers to select customers and suppliers. The bill does not attempt to prevent these sound reasons from operating.

"While the bill does not prevent handlers and producers from dealing with one another individually on a direct basis, it does prevent handlers from exerting any improper pressure in an effort to weaken associations or discourage membership. While the bill does not require a handler to deal with an association of producers, it certainly makes clear that farmers have a right to form such associations and should be protected in the exercise of this right. The fact is clear that an association of producers which has obtained the voluntary membership of a large number of farmers deserves respect and recognition by the handler of agricultural products." HR Rep No 824, S Rep No 474, 90th Cong 2d Sess, reprinted in 1968 US Code Cong & Ad News, pp 1867, 1873.

Section 2304's disclaimer of any congressional intent to affect pre-existing freedom to deal individually cannot be read as a creation of new rights or an express new statutory protection of old rights; nor can it be read as precluding a state from choosing to adjust pre-existing freedom to deal.

Given our interpretation of FAFPA, we cannot see how AMABA "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress". As we have indicated, congressional intent was directed at improving the bargaining position of individual producers by protecting them from handler coercion in their choice to join a cooperative marketing association. We discern no intent on the part of Congress, as plaintiffs assert, to affirmatively "strike a balance"

among competing interests, including protecting a handler's right to deal directly with a producer or vice versa. In our view, the provisions of AMABA affording exclusive representation to a producers' cooperative created by a majority of the producers of a particular commodity, and the requirement of service fees, was a step by the Michigan Legislature into a previously unregulated area; a step which furthers both the goals of FAFPA and others not prevented by FAFPA by taking an active role in enhancing the bargaining position of producers, protecting not only individuals, but also their associations from internal and external pressures.

FAFPA's producer protections only indirectly affect cooperative associations as associations. Its principal purpose is to insulate individual producer choice from handler coercion. AMABA duplicates these individual protections, but goes further to recognize and insure the *association's* continued right to exist as a separate entity. AMABA's exclusive representation provisions insulate the association from handler attacks on its membership by eliminating the possibility of "sweetheart" offers made to non-association producers, but not to the association's membership. Without doubt, if the purpose of a "sweetheart" offer made to one producer is to coerce another in his choice of association membership, then the handler would be in violation of § 2303(a) of FAFPA. The obvious difficulty in proving such indirect coercion, especially since the justification for a superior offer may rest upon an array of ostensibly sound but often subjective economic factors such as a handler's assessment of quality, is eliminated under an exclusive representation system.

Similarly, AMABA's service fee provisions pro-

tect the association's integrity by eliminating the incentive for a producer to be a "free rider", accepting the benefits of association representation without assisting in its cost.[14]

Though Congress disavowed the creation of a mini-Wagner Act to accomplish its purpose, nothing in FAFPA can be construed as preventing Michigan from adopting such an approach to accomplish a broader purpose though one inclusive of the federal purpose and one which, in fact, furthers the desire of Congress "to establish standards of fair practices required of handlers in their dealings in agricultural products". 7 USC 2301.

## B

Plaintiffs also assert that compliance with both FAFPA and AMABA is physically impossible and thus, under the second prong of conflict pre-emption analysis, the Michigan act must fall. The basis of plaintiffs' claim is its view that *Butz v Lawson Milk Co,* 386 F Supp 227 (ND Ohio, 1974) and *Garrison v Dairymen,* Civil Action No. 80-1080-3 (D SC, 1980) (slip op) interpreted FAFPA to *require* what AMABA forbids, *viz.:* that a handler deal with a producer if the producer so desires. That position is simply incorrect. Such an interpretation of FAFPA would, on its face, conflict

---

[14] In his opinion, Circuit Judge Thomas Brown specifically found:

"The problems of the 'free rider' (a non-member who enjoys the co-op price without belonging or paying) and the 'sweetheart contract' (a device engaged in by processors to erode the power of the voluntary co-operative) will both be made obsolete by the provisions of the act."

His finding that these problems existed prior to AMABA's enactment is amply supported in the record by the testimony of witnesses John Handy, producer and organizer of the Great Lakes Cherry Producers Marketing Cooperative, a voluntary marketing association in existence from 1957 to 1967; Dr. James Schaffer, professor of agricultural economics at Michigan State University and a participant in the drafting of AMABA; George Stover, owner and operator of a 700-acre farm; and Noel Stuckman, who was the General Manager of MACMA and an MACMA employee since November, 1971.

with what § 2304 says about the act. Though both courts found handlers in violation, or probably in violation, of FAFPA, it was because the handler's refusal to deal with the producers involved had a coercive effect on the producers' choice of whether to join an association.

In *Butz,* a handler refused to deal with a producer who had assigned to a producer association the exclusive right to sell his milk. In *Garrison,* producers of milk sought an injunction against a handler who refused to accept their milk unless they joined an association of milk producers. In both cases the courts' decisions were directed toward preventing *handler* coercion. Nothing in either case can be fairly read to suggest that the *state* requirement of exclusive association representation of all unit members makes it physically impossible to comply with both acts.

Association representation, or non-representation, under the Michigan act may not be coerced by a handler just as it may not under FAFPA. Simply because the State of Michigan has required under AMABA what a handler cannot require under either AMABA or FAFPA does not render compliance with the two acts physically impossible. The producer protection afforded under FAFPA was a protection against handler abuse. Those same protections, and the resulting conduct required of handlers, are afforded by AMABA. Indeed, the protections afforded by § 2303 of FAFPA are virtually identical with those of § 4 of AMABA. Though AMABA regulates more extensively than FAFPA, it substantially duplicates FAFPA's prohibitions on handler conduct. Since the identical prohibitions are placed on handler conduct, and since AMABA's additional provisions pertain only to producers, an area left unregulated

by FAFPA, we perceive no physical impossibility of compliance with both acts.

For the foregoing reasons, we find no pre-emption of AMABA by FAFPA.

## II

Plaintiffs' second constitutional attack focuses on a claimed violation of their due process rights[15] on the theory that AMABA is an illegitimate exercise of the state's police power.

## A

The applicable test for determining whether a legislative enactment is a legitimate exercise of the state's police power consistent with due process requirements is twofold: a) does it address a proper public purpose, and b) is the remedy adopted reasonably related to the stated public purpose? *Michigan Canners & Freezers Ass'n, Inc v Agricultural Marketing & Bargaining Board,* 397 Mich 337, 343-344; 245 NW2d 1 (1976). A successful constitutional challenge to a legislative enactment on police power grounds requires

"the party challenging the act [to carry] the burden of overcoming the presumption of constitutionality which accrues to the statute. *Irishman's Lot, Inc v Secretary of State,* 338 Mich 662, 667; 62 NW2d 668 (1954); *Thayer v Dep't of Agriculture,* 323 Mich 403, 410; 35 NW2d 360 (1949). To overcome this presumption, plaintiff must show either that there is no public purpose to be served by the statute, or that there is no reasonable

[15] Article 1, § 17, of the Michigan Constitution provides that: "[n]o person shall * * * be deprived of life, liberty, or property, without due process of law". Similarly, the 14th Amendment to the United States Constitution provides that "* * * [n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

relationship between the remedy adopted by the Legislature and the public purpose. *Grocers Dairy Co v Dep't of Agriculture,* 377 Mich 71, 75; 138 NW2d 767 (1966); *Carolene Products Co v Thomson,* 276 Mich 172, 178; 267 NW 608 (1936)."

In *Shavers v Attorney General,* 402 Mich 554, 613, 614; 267 NW2d 72 (1978), we announced that what

"this 'presumption of constitutionality' means, in terms of challenged police power legislation, is that in the face of a due process or equal protection challenge, 'where the legislative judgment is drawn in question', a court's inquiry 'must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it'. *United States v Carolene Products Co,* 304 US 144, 154; 58 S Ct 778; 82 L Ed 1234 (1938). A corollary to this rule is that where the legislative judgment *is supported by 'any state of facts either known or which could reasonably be assumed',* although such facts may be 'debatable', the legislative judgment must be accepted. *Carolene Products Co v Thomson,* 276 Mich 172, 178; 267 NW 608 (1936)."

We went on in *Shavers,* p 617, relying on our preliminary disposition in this case, to demonstrate that when challenged police power legislation is "important, complicated, novel or experimental legislation", there may be a need to conduct a trial to establish facts necessary to evaluate the challenge. Because of the remand of this case to the circuit court and the proceeding conducted there, such fact development has now occurred. Our task is now the same as it was in *Shavers,* p 618.

"First, we must determine from the record before us whether plaintiffs have overcome the presumption of

constitutionality by showing facts which reveal that the legislative judgment is without rational basis, or, to the same effect, we must determine from the record whether the challenged legislative judgment is supported by *any* reasonable state of facts justifying its enactment. Second, we must then determine whether the legislative response bears a reasonable relation to this identified objective."

Plaintiffs claim that AMABA is designed simply to promote higher prices and upgrade the economic position of producers vis-à-vis handlers, a purpose they characterize as establishing "price security", and one not subsumed within the purposes of legitimate legislative regulation.[16] Having so defined and limited the purposes of AMABA, plaintiffs argue by analogy to *Shakespeare Co v Lippman's Tool Shop Sporting Goods Co,* 334 Mich 109; 54 NW2d 268 (1952), that AMABA must be struck down as an unconstitutional attempt to establish price security, an endeavor directed at disruption of the operation of a free market and thus inconsistent with the public interest.[17] The

[16] In plaintiffs-appellants' brief in this Court, they argue:

"[T]he act is absolutely barren of any ostensible relationship to a valid police power objective. It lacks any indication that it is necessary for the preservation of public health, safety, morals or general welfare, or to prevent fraud. It is not designed as a sanitary measure, or as a method by which impure foods are kept from the tables of the consuming public. Instead, the act attempts to promote price and upgrade the economic position of producers vis-à-vis handlers. This avowed public purpose is constitutionally infirm, since the courts have consistently rejected the concept of price security as a proper basis for the use of the state's police power. *Baldwin v Seelig,* 294 US 511; 55 S Ct 497; 79 L Ed 1032 (1935); *Van Winkle v Fred Meyer, Inc,* 151 Or 455, 471; 49 P2d 1140, 1146 (1935); *People v Kuc,* 272 NY 72; 4 NE2d 939 (1936); *Good Humor Corp v City of New York,* 33 NYS2d 905 (S Ct, 1942), *aff'd* 264 AD 620; 36 NYS2d 85 (1942), *aff'd* 290 NY 312; 49 NE2d 153 (1943)."

[17] According to plaintiff, *Shakespeare* stands for the proposition that legislation authorizing the vicarious binding of independent businessmen by transactions to which they have not consented exceeds the state's police power. This is an excessively broad reading of *Shakespeare* and does not withstand scrutiny. The fair trade laws

error in attempting to analogize to *Shakespeare* is inevitable in light of plaintiffs' initial premise that AMABA is aimed at price security and as such is an unnecessary and, because it disrupts the operation of a free healthy market, an unconstitutional intrusion into private enterprise.

Our reading of the act, examination of the circuit judge's opinion and review of the record lead us to conclude that AMABA was not directed toward achieving price security for producers at the expense of the operation of a free market, but was, instead, only intended to overcome an artificial obstacle to the operation of supply and demand forces, *viz.,* the fortuitous position of handlers of perishable agricultural products in the chain of marketing such commodities which permitted handlers to distort free market forces by demanding prices not wholly reflective of supply and demand. AMABA is not a price-fixing act, nor is it intended to allow association control of the output of individual farmers. It is, rather, an enabling act which seeks solely to promote the equalization of bargaining power between producers and processors of perishable products.

The circuit court found as facts that the following conditions existed prior to AMABA's enactment:

a) Growers faced the problem of disposing of extremely perishable fruits and vegetables with a corresponding lack of freezing and/or storage facilities.

b) There existed large numbers of unorganized growers who, when aligned against a concentration of processors, could not individually affect the price paid for their product by processors.

struck down in *Shakespeare* were invalidated because they had nothing to do with a public purpose.

c) The market lacked an extensive number of processors and the growers lacked ability to transport perishable goods any distance.

d) Processors were reluctant to recognize voluntary grower cooperative bargaining associations.

e) Processors were known by growers to discriminate against persons who belonged to cooperative bargaining associations.

f) It was difficult to develop and maintain voluntary bargaining associations because some persons obtained a "free ride" (i.e., accepted the benefits of cooperative bargaining without assisting in its cost).

g) There existed a "take it or leave it" pricing policy with no authority in the fieldmen of the processors to negotiate price.

h) The processor possessed the resources to obtain superior marketing knowledge, while the grower lacked time to obtain or digest information.

i) Any effective producer association would require statewide organization with emphasis on particular products.

j) Growers sometimes engaged in picketing of processors and withholding perishable goods because of unsatisfactory prices.

k) It was difficult to coordinate production and marketing decisions so as to reduce spoilage. Processor failure to announce a price early in the marketing season sometimes led to the withholding of harvested commodities until some spoilage had occurred.

l) Prices received by farmers fluctuated greatly.

m) Supply and demand did play a role in affecting pricing decisions.

All of these findings are amply supported by the record. Taken as a whole, they establish a dispar-

ity in bargaining power resulting in disruption of the orderly marketing of perishable agricultural commodities and the imposition of inequitable economic pressure upon independent producers.

Whatever economic advantage plaintiff processors enjoyed prior to AMABA, and lost because of it, was not so much the result of astute investment of labor or capital as it was the sheer nature of agricultural marketing and the processors' superior position of power in the chain necessary to bring a commodity to the consumer. To the extent bargaining power is equalized, the assumptions of economic theory are validated and the operation of a free market is enhanced. Nothing in AMABA inhibits more producers or processors from entering the market. Nothing in AMABA dictates the price at which agricultural products must be sold or how producers or processors should conduct their business except when it comes time to deal with each other. Thus, the act operates to free the market forces of supply and demand to overcome the artificial price-setting power otherwise vested in processors.[18]

We are confident that legislation designed to enable the producers of agricultural commodities representing more than 27% of the value of this

---

[18] Presumably cooperative associations will not find it in their best interests to bargain for excessive prices since processors are free to abandon Michigan producers altogether and fill their needs outside the state. Furthermore, in the event that both parties are unable to agree on a price, yet wish to deal, the dispute will be settled by arbitration. MCL 290.716; MSA 12.94(116).

At least in theory the parties will be engaged in negotiations that will result in a price reflective of the supply available and the demand among consumers for that product. Furthermore, because the relationship between agricultural producers and processors tends to extend over the long run, it will be in the producers' interests to moderate demands when supply is short in exchange for a reasonable price when supply is abundant. Such a moderation should lead to price stability beyond that afforded by exclusive representation and thus to even more efficient planning.

state's annual agricultural yield[19] to better protect themselves from the unfair imposition of prices by processors and thereby to improve and insure the production and marketing of perishable fruits and vegetables is within the historically viewed ambit of a legitimate legislative purpose. See *Cady v Detroit,* 289 Mich 499; 286 NW 805 (1939).

### B

Having concluded that the legislative purpose behind AMABA was to equalize bargaining power between a relatively small number of processors and a large number of producers, thereby eliminating both the potential for economically rational, but unfairly abusive, price-setting by processors and the potential for disrupting the marketing of perishable agricultural products, and having found these purposes to be in the interests of the public welfare, we also find AMABA's provisions reasonably related to those purposes. We find a sufficient and rational relationship between those provisions in AMABA enabling producers to bargain collectively, those protecting producer associations from being weakened through sweetheart deals and free-riders by providing for exclusive representation and service fees, and those providing for compulsory arbitration for resolving impasses with respect to terms subject to bargaining on the one hand, and the Legislature's intent to equalize bargaining power and thereby ensure orderly marketing of perishable, agricultural commodities on the other. We agree with the circuit court that this "act solves some problems [and]

[19] This figure is drawn from the testimony and exhibits of Dr. Lawrence Van Mier who was, at the time of his testimony, Director of the Division of Economics and Statistics of the National Canners Association. It is based on volume and value averages for the years 1968 through 1972.

creates others" but, on the whole, as demonstrated by competent evidence, it is "reasonably related to the problems perceived by the Legislature and is a reasonable attempt to solve at least some of the problems". We add that the difficulty in assessing whether these goals have yet been achieved does not diminish their legitimacy; "it is precisely because regulation in the economic field often deals with long-term developments that the Court treats such legislation with great deference." *Shavers*, p 629. We find AMABA constitutional on its face.

## III

Plaintiffs also argue that the subject matter of AMABA exceeds the scope of its title in violation of Const 1963, art 4, § 24, mandating that "[n]o law shall embrace more than one object, which shall be expressed in its title". The title of AMABA states:

"An act to permit producers of agriculture commodities to be represented by associations; to create an agricultural marketing and bargaining board; to provide for the accreditation of associations; to establish obligations on the part of handlers and associations; to provide for arbitration; to define unfair practices; and to prescribe penalties."

Plaintiffs assert that since the substance of AMABA *compels* association representation of producers once a majority wants such representation and since the title speaks only to *permitting* such representation, the act exceeds its title in this respect and must be invalidated accordingly.

Plaintiffs' argument is not well taken. "The title need not serve as an index; it is sufficient if it fairly expresses the subject of the legislation and

conveys comprehension of its germane provisions". *Krench v Michigan,* 277 Mich 168, 175; 269 NW 131 (1936). The title accomplishes that task in this case. AMABA does not, in the first instance, *require* producer representation by association. Instead, it provides for a mechanism permitting producers to organize themselves and then, only when a majority agrees, the system operates to sweep even the reluctant producer into the association's sphere of authority. The act enables self-motivated producers who want to be represented by an association to undertake to accomplish that task without fear of reprisal by handlers. It is in this sense that AMABA permits producers to be represented by associations. The compulsory aspect of AMABA is secondary but very much germane to its primary permissive-enabling function in that exclusive representation is an additional safeguard to the majority wanting representation by association. In a very real sense requiring representation of the minority permits representation of the majority.

While the Legislature may have more accurately reflected the scope of the act by substituting the phrase "provide for" for "permit" in the title and thereby steer a more neutral course between the elements of permissiveness and compulsion, both part of the act, we do not believe the title, as it stands, promotes deceit or subterfuge or fails adequately to assess the contents of AMABA. In adhering to Justice COOLEY's admonition that our constitutional title-object provision "be construed reasonably, and not in so narrow and technical a sense as unnecessarily to embarrass legislation", *Ryerson v Utley,* 16 Mich 269, 277 (1868), we do not find that the substantive provisions of AMABA exceed the scope of its title.

IV

Plaintiffs' final contention is that the Administrative Procedures Act of 1969, MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.,* is applicable to the accreditation proceedings of the AMABA. In our 1976 remand of this case to the trial court, we indicated that the circuit judge could render an opinion as to the APA's applicability to board accreditation procedures, but was foreclosed from issuing a dispositive order on the question since original jurisdiction over substantive challenges to such board determinations (orders)[20] is vested in the Court of Appeals, pursuant to MCL 290.705(2); MSA 12.94(105)(2). As a practical matter, what we ordered the circuit judge to do was to assist us in issuing a declaratory judgment. He has done so, concluding that accreditation proceedings under AMABA are "contested cases" within the meaning of § 3(3) of the APA, MCL 24.203(3); MSA 3.560(103)(3), and therefore subject to the procedural safeguards of the APA. We agree with that assessment and so hold.

Section 3(3) of the APA provides:

" 'Contested case' means a proceeding * * * in which a determination of the legal rights, duties, or privileges of a named party is required by law to be made by an agency after an opportunity for an evidentiary hearing."

Association accreditation requirements and procedures are set forth in §§ 7, 8, 9, and 10 of

---

[20] In our earlier opinion, we decided that an accreditation determination is an order within the meaning of § 5(2) of AMABA. *Michigan Canners & Freezers Ass'n, Inc v Agricultural Marketing & Bargaining Board,* 397 Mich 337; 245 NW2d 1 (1976).

AMABA.[21] Section 7 establishes the minimum standards an association must meet to qualify for accreditation. Sections 8, 9, and 10 discuss the mechanics of the process. Section 8(1) provides:

"An association desiring accreditation shall file with the board a written request for accreditation in the form as required by the board. The request shall contain properly certified evidence that the association meets the standards for accreditation and shall be accompanied by a report of the names and addresses of members, the name of each handler to whom the member delivered or contracted to deliver the agricultural commodity during the previous 2 marketing periods and the quantity delivered. A fee to cover the costs of the board in processing the request shall be established by rule and paid by the association when the request is filed."

Section 9 states:

"(1) Within 60 days following the date of filing with the board a request for accreditation by an association, the board shall determine whether the association shall be accredited. If the board determines that insufficient evidence was filed by the association, the board may permit the association to file an amended request for accreditation within 30 days following the determination and notification of the association.

"(2) Within 30 days following the board's preliminary finding that the association is to be accredited, the board shall hold a public hearing to obtain further evidence relevant to confirmation that the association is to be accredited. Producers of record involved in the bargaining unit shall be notified of the hearing by mail and publication in a newspaper of general circulation in the bargaining unit area at least 10 days prior to the date of the hearing."

[21] MCL 290.707 through 290.710; MSA 12.94(107) through 12.94(110).

Finally, § 10(1), (2) provides:

"(1) The board shall issue and publish its determination within 30 days after the close of the hearing. If the determination of the board is to accredit the association, the board shall include a preliminary declaration of accreditation in its determination. The preliminary declaration of accreditation shall clearly state that the association shall represent all producers, members and nonmembers alike, who are in the bargaining unit and act as exclusive sales agents for the bargaining unit in negotiations with handlers. A producer covered in a declaration of accreditation may join the association and have full membership rights therein. Handlers shall deduct marketing service fees from the proceeds to be paid to producers for the agricultural commodity in the amount as determined by the association and forward the service fees promptly to the association. The fees shall be within guidelines determined by the board and shall be subject to review by the board upon petition by 15% of the affected producers.

"(2) The accreditation of the association by the board shall be effective 30 days after the publication of the preliminary declaration of accreditation. The board shall delay the accreditation of the association whenever it receives during the 30-day period a petition signed by at least 1/3 of the producers in the bargaining unit who produce at least 1/3 of the production of the agricultural commodity produced by the bargaining unit, exclusive of quantities contracted with processing cooperatives and produced by handlers, and requesting that the association should not be accredited. The board shall determine by a mail referendum of bargaining unit producers within 30 days following receipt of the petition if producers assent to the accreditation of the association. Producers in the bargaining unit shall be deemed to have assented to accreditation if more than 50% of the producers in the bargaining unit who produce more than 50% of the volume of the affected commodity assent to representation by the association."

These provisions establish that when an associa-

tion files with the board[22] a request for accreditation and supporting documentation of compliance with § 7 requirements, the board has 60 days to evaluate the request and determine whether the supporting evidence sufficiently discloses compliance with § 7 requirements. Within 30 days following the board's finding of sufficient evidence to support the request, "the board shall hold a public hearing to obtain further evidence relevant to confirmation that the association *is to be accredited*". This plain language demonstrates that prior to a hearing, the board cannot make a final accreditation determination. The language of § 10 reinforces this conclusion, as it provides, "The board shall issue and publish its determination within 30 days *after the close of the hearing*". We therefore reject defendants' claim that the accreditation determination is actually made before the hearing and thus is not within the definition of a contested case.

To the contrary, we find, in the AMABA accreditation provisions, all the definitional elements of a contested case. The board is an "agency" since it is created by statute.[23] The proceedings before the board involve the determination of the duties, rights, and privileges of a named party, the association, to wit, the Michigan Asparagus Growers Division of MACMA. The rights, duties, or privileges involved are this association's authority to act and be recognized as the exclusive bargaining agent for all producers in the unit. Finally, the board's accreditation determination could be made only after an opportunity for an evidentiary hear-

[22] The "board", as defined in MCL 290.702(d); MSA 12.94(102)(d), is the agricultural, marketing, and bargaining board created in MCL 290.703; MSA 12.94(103).

[23] " 'Agency' means a * * * board * * * created by * * * statute". MCL 24.203(2); MSA 3.560(103)(2).

ing where presumably any producer who did not want to be represented by the association could challenge the evidence supporting the association's request for accreditation or make any other lawful challenge to the association's accreditation.

We cannot find, as defendants have, a legislative intent inherent in AMABA to foreclose application of the APA to AMABA's accreditation proceedings. The failure of AMABA to make specific reference to the APA in the accreditation provisions, while making specific reference to it in three other AMABA provisions,[24] does not, as defendants contend, require application of the maxim *expressio unius est exclusio alterius* and the conclusion that the Legislature did not intend the APA to apply to board accreditation. This is so because the APA defines its own applicability and is not dependent upon express legislative invocation. The applicability of the APA, absent an express exclusion, is governed by a determination whether the statutory agency action falls within the APA's purview. We have concluded, in the present context, that board accreditation proceedings are contested cases within the meaning of the APA. There being no express legislative statement in the AMABA excluding the APA's application, our inquiry is at an end. The APA is applicable.

We note that the parties have stipulated in this case that should this Court find the APA applicable to board accreditation proceedings, all parties will be adequately protected by a "prospective only" ruling. That is, they are in agreement that noncompliance with the APA need not void the accreditation of the Michigan Asparagus Growers Division of MACMA. We therefore do not consider

[24] See MCL 290.703(8); MSA 12.94(103)(8), MCL 290.704(3); MSA 12.94(104)(3), MCL 290.716(1); MSA 12.94(116)(1).

whether, as a policy matter, it would have been prudent or proper for this Court to determine if, in fact, the procedures followed by the board in its accreditation process were in compliance with the APA, apart from pointing out that the Court of Appeals is vested with original jurisdiction over challenges to final board orders.[25]

FITZGERALD, C.J., and KAVANAGH, WILLIAMS, LEVIN, and COLEMAN, JJ., concurred with RYAN, J.

RILEY, J., took no part in the decision of this case.

[25] MCL 290.705(2); MSA 12.94(105)(2).