MICHIGAN CANNERS & FREEZERS ASSOCIATION, INC., ET AL. *v.* AGRICULTURAL MARKETING AND BARGAINING BOARD ET AL.

No. 82–1577.   Argued March 19, 1984—Decided June 11, 1984

*Joseph G. Scoville* argued the cause for appellants. With him on the briefs were *Ernest M. Sharpe* and *Jon D. Botsford.*

*John H. Garvey* argued the cause for the United States as *amicus curiae* urging reversal. With him on brief were *Solicitor General Lee* and *Deputy Solicitor General Geller.*

*James A. White* argued the cause for appellees and filed a brief for appellee Michigan Agricultural Cooperative Marketing Association, Inc. With him on the brief were *Theodore W. Swift* and *Michael J. Schmedlen. Frank J. Kelley,* Attorney General of Michigan, *Louis J. Caruso,* Solicitor General, and *Charles D. Hackney, Henry J. Boynton,* and *Michael J. Moquin,* Assistant Attorneys General, filed a brief for appellee Agricultural Marketing and Bargaining Board.*

JUSTICE BRENNAN delivered the opinion of the Court.

A perceived need to help the American farmer in his economic relations with large and powerful agricultural processors has moved Congress and various States to enact laws designed to bolster the farmer's bargaining power when bringing his goods to market. This case involves two such laws: the federal Agricultural Fair Practices Act of 1967 and the State of Michigan's Agricultural Marketing and Bargaining Act (Michigan Act). The question presented is whether certain provisions of the Michigan Act, which accord agricultural cooperative associations exclusive bargaining authority for the sale of agricultural products, are pre-empted by the federal Act. The Supreme Court of Michigan held that the Michigan Act is not pre-empted. 416

---

*Briefs of *amici curiae* urging reversal were filed for the American Frozen Food Institute by *James F. Rill* and *Norman G. Knopf;* and for the National Food Processors Association by *H. Edward Dunkelberger, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the American Farm Bureau Federation by *John J. Rademacher* and *C. David Mayfield;* and for the California Tomato Grower's Association et al. by *Gerald D. Marcus.*

Mich. 706, 332 N. W. 2d 134 (1982). We noted probable jurisdiction, 464 U. S. 912 (1983), and now reverse.

## I

### A

The federal Agricultural Fair Practices Act (AFPA), 82 Stat. 93, 7 U. S. C. § 2301 *et seq.*, protects the right of farmers and other producers[1] of agricultural commodities to join cooperative associations through which to market their products.[2] Responding to "the growing concentration of power in the hands of fewer and larger buyers [of agricultural products]," S. Rep. No. 474, 90th Cong., 1st Sess., 2–3 (1967), Congress enacted the AFPA to rectify a perceived imbalance in bargaining position between producers and processors of such products. Although the Act's principal purpose is to protect individual producers from interference by processors when deciding whether to belong to a producers' association, the Act also protects the producer from coercion by associations of producers. The AFPA thus provides that it is unlawful for either a processor or a producers' association to engage in practices that interfere with a producer's freedom to choose whether to bring his products to market himself or to sell them through a producers' cooperative association. 7 U. S. C. § 2303. Specifically, § 2303(a) forbids "handlers"—

---

[1] Title 7 U. S. C. § 2302(b) defines the term "producer" to mean "a person engaged in the production of agricultural products as a farmer, planter, rancher, dairyman, fruit, vegetable, or nut grower."

[2] Under § 1 of the Capper-Volstead Act, 7 U. S. C. § 291, and § 6 of the Clayton Act, 15 U. S. C. § 17, most activities of agricultural cooperatives were already exempt from the antitrust laws. Thus, producers already had a legal right to belong to such associations. The AFPA went further than the prior Acts by protecting the right against economic coercion.

The term "association of producers," also referred to herein as "producers' associations," is defined to mean "any association of producers of agricultural products engaged in marketing, bargaining, shipping, or processing as defined in section 1141(j) of title 12, or in section 291 of this title." 7 U. S. C. § 2302(c).

defined to include both processors and producers' associations[3]—to "coerce any producer in the exercise of his right to join and belong to or to refrain from joining or belonging to an association of producers." Similarly, § 2303(c) forbids handlers to "coerce or intimidate any producer to enter into, maintain, breach, cancel, or terminate a membership agreement or marketing contract with an association of producers or a contract with a handler."[4]

---

[3] The term "handler" generally refers to buyers and processors of agricultural products. As the AFPA evolved through the legislative process, however, and Congress decided to apply most of its prohibitions to producers' associations as well as to handlers, Congress expanded the definition of "handler" to include associations of producers. Thus 7 U. S. C. § 2302(a) provides:

"The term 'handler' means any person engaged in the business or practice of (1) acquiring agricultural products from producers or associations of producers for processing or sale; or (2) grading, packaging, handling, storing, or processing agricultural products received from producers or associations of producers; or (3) contracting or negotiating contracts or other arrangements, written or oral, with or *on behalf of producers or associations of producers* with respect to the production or marketing of any agricultural product; or (4) acting as an agent or broker for a handler in the performance of any function or act specified in clause (1), (2), or (3) of this paragraph" (emphasis added).

In addition, 7 U. S. C. § 2302(d) provides that "the term 'person' includes individuals, partnerships, corporations, and *associations*" (emphasis added).

The term "processor" is used herein to refer to all "handlers" under the federal Act except producers' associations acting in their capacity as marketing representatives of producers.

[4] Section 2303 provides in full:

"It shall be unlawful for any handler knowingly to engage or permit any employee or agent to engage in the following practices:

"(a) To coerce any producer in the exercise of his right to join and belong to or to refrain from joining or belonging to an association of producers, or to refuse to deal with any producer because of the exercise of his right to join and belong to such an association; or

"(b) To discriminate against any producer with respect to price, quantity, quality, or other terms of purchase, acquisition, or other handling of agricultural products because of his membership in or contract with an association of producers; or

The Michigan Act, Mich. Comp. Laws § 290.701 *et seq.* (1984), also designed to facilitate collective action among producers, includes the same prohibitions as the federal Act. It goes beyond the federal statute, however, by extensively regulating the activities of producers' associations. Most importantly, the Michigan Act establishes a state-administered system by which producers' associations are organized and certified as exclusive bargaining agents for all producers of a particular commodity. §§ 290.703, 290.707. Under Michigan's system, if an association's membership constitutes more than 50% of the producers of a particular commodity, and its members' production accounts for more than 50% of the commodity's total production, the association may apply to the state Agricultural Marketing and Bargaining Board for accreditation as the exclusive bargaining agent for all producers of that particular commodity. § 290.707(c).[5] When the

---

"(c) To coerce or intimidate any producer to enter into, maintain, breach, cancel, or terminate a membership agreement or marketing contract with an association of producers or a contract with a handler; or

"(d) To pay or loan money, give any thing of value, or offer any other inducement or reward to a producer for refusing to or ceasing to belong to an association of producers; or

"(e) To make false reports about the finances, management, or activities of associations of producers or handlers; or

"(f) To conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by this chapter."

[5] Section 290.707 provides in pertinent part:

"An association shall be accredited upon determination by the board that the association meets all of the following:

.           .           .           .           .

"(c) The association has marketing and bargaining contracts for the current or next marketing period with more than 50% of the producers of an agricultural commodity who are in the bargaining unit and these contracts cover more than 50% of the quantity of that commodity produced by producers in the bargaining unit. The board may determine the quantity produced by the bargaining unit using information on production in prior marketing periods, current market information, and projections on production during the current market periods. The board shall exclude from that quantity any quantity of the agricultural commodity contracted by pro-

Board accredits an association as the agent for the producers of a particular commodity, all producers of that commodity, regardless of whether they have chosen to become members

ducers with producer owned and controlled processing cooperatives and any quantity produced by handlers. An association whose main purpose is bargaining but which processes a surplus into a form which is not the subject of bargaining is not a processing cooperative. The contracts with members shall specify the agricultural commodity and that the members have appointed the association as their exclusive agent in negotiations with handlers for prices and other terms of trade with respect to the sale and marketing of the agricultural commodity and obligate them to dispose of their production or holdings of the agricultural commodity through or at the direction of the association."

The Michigan Act also provides a mechanism whereby producers of various commodities are divided into "bargaining units" so that, once an association is accredited, it represents essentially 100% of the production of the commodity produced by its members. Thus § 290.706 provides:

"(1) The board shall determine whether a proposed bargaining unit is appropriate. This determination shall be made upon the petition of an association representing not less than 10% of the producers of the commodity eligible for membership in the proposed bargaining unit as defined by the association. An association with an overlapping definition of bargaining unit may, upon the presentation of a petition by not less than 10% of the producers eligible for membership in the overlapping bargaining unit, contest the proposed bargaining unit. . . .

"(2) In making its determination, the board shall define as appropriate the largest bargaining unit in terms of the quantity of the agricultural commodity produced, the definition of the agricultural commodity, geographic area covered and number of producers included as is consistent with the following criteria:

"(a) The community of interest of the producers included;

"(b) The potential serious conflicts of interests among members of the proposed unit;

"(c) The effect of exclusions on the capacity of the association to effectively bargain for the bargaining unit as defined;

"(d) The kinds, types and subtypes of products to be classed together as agricultural commodity for which the bargaining unit is proposed;

"(e) Whether the producers eligible for membership in the proposed bargaining unit meet the definition of "producer" for the agricultural commodity involved;

"(f) The wishes of the producers;

"(g) The pattern of past marketing of the commodity."

468

of the association, must pay a service fee to the association and must abide by the terms of the contracts the association negotiates with processors. §§ 290.710(1), 290.713(1).[6] Thus, the Michigan Act creates an "agency shop" arrangement among agricultural producers whenever there is majority support for such an arrangement among the producers of a particular commodity.

## B

The Michigan Agricultural Cooperative Marketing Association, Inc. (MACMA), a producers' association accredited under the Michigan Act, is the sole sales and bargaining representative for asparagus producers in the State.[7] In 1974, as permitted by the Michigan Act, MACMA negotiated contracts on behalf of Michigan asparagus growers to sell the 1974 asparagus crop. In response, appellants Dukesherer Farms and Ferris Pierson, asparagus growers that would be bound by the contract, along with the Michigan Canners & Freezers Association, Inc., an association of asparagus processors,[8] sued MACMA in state court seeking a declaratory judgment that those provisions of the Michigan Act requiring service fees and mandatory adherence to an association-negotiated contract are pre-empted by the AFPA. The Supreme Court of Michigan rejected appellants' claim, holding that the Michigan Act operated in an area that the federal

---

[6] Although the Michigan Act does not explicitly prohibit a producer represented by an accredited association from negotiating directly with a processor, it does prohibit the processor from negotiating with such a producer. § 290.704(1)(h). The Michigan Act thus effectively eliminates direct dealing between a producer that is represented by an accredited association and a processor.

[7] The bargaining unit for which MACMA is accredited includes all Michigan farmers who produced a certain minimum quantity of asparagus during a defined marketing period.

[8] The Michigan Canners & Freezers Association, Inc., is an association of fruit and vegetable processors whose members process asparagus. Dukesherer Farms, Inc. is a corporation engaged in asparagus farming. And Ferris Pierson is an individual engaged in asparagus farming.

Act did not regulate. 416 Mich. 706, 332 N. W. 2d 134 (1976). Specifically, the Michigan court held that the federal Act prohibited only processor misconduct, whereas the challenged portions of the Michigan Act regulated producers' activities. We disagree.

## II

Federal law may pre-empt state law in any of three ways. First, in enacting the federal law, Congress may explicitly define the extent to which it intends to pre-empt state law. *E. g., Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 95–96 (1983). Second, even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. *E. g., Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 153 (1982); *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). See also *Fidelity Federal Savings & Loan Assn., supra,* at 153.

It is the last basis of pre-emption that applies in this case. The AFPA contains no pre-emptive language; nor does it reflect a congressional intent to occupy the entire field of agricultural-product marketing. Indeed, the Act states that it "shall not be construed to change or modify existing State law." 7 U. S. C. § 2305(d).[9] And, as this Court has rec-

---

[9] Appellee MACMA argues that this provision eliminates the pre-emptive effect the AFPA might otherwise have on the Michigan Act, despite the fact that the Michigan Act was enacted after the enactment of the

ognized, "the supervision of the readying of foodstuffs for market has always been deemed a matter of peculiarly local concern." *Florida Lime & Avocado Growers, Inc., supra,* at 144.

Appellants contend that the service-fee and mandatory-representation provisions of the Michigan Act frustrate the purpose and objective of the AFPA by imposing on unwilling producers an exclusive bargaining arrangement with associations. In their view, although Congress' chief interest in enacting the AFPA was to facilitate the growth of agricultural cooperative associations, an equally important congressional objective was to preserve the free choice of producers to join associations or to remain independent. The Michigan Act, appellants contend, deprives producers of that choice and allows associations, in effect, to coerce producers into association affiliation.[10]

## A

We turn first to the wording of the AFPA. The Act begins with a finding that "the marketing and bargaining position of individual farmers will be adversely affected unless

---

AFPA. Brief for Appellee MACMA 8–14. MACMA contends that at the time of the passage of the AFPA, California's Agricultural Prorate Act, upheld by this Court in *Parker* v. *Brown,* 317 U. S. 341 (1943), contained provisions "similar" to the provisions of the Michigan Act. Even if we were to accept MACMA's interpretation of § 2305(d), however, this argument is unpersuasive. The California Prorate Act bears no relevant similarity to the Michigan Act. The California Act provides for the orderly marketing of certain commodities by imposing marketing plans that restrict the quantity of a commodity that farmers may produce, regulate the flow of commodities to market, and establish grade and quality requirements. The basic goal of the California Act, as identified in *Parker* v. *Brown,* is to minimize the adverse effects of a market surplus. 317 U. S., at 355.

[10] Appellants argue that the AFPA accords processors the right to deal with producers individually and that the Michigan Act deprives processors of that right. This conflict, they contend, provides an additional basis upon which to decide that the Michigan Act is pre-empted. In light of our disposition of appellants' primary claim, however, we need not address that question.

they are free to join together *voluntarily* in cooperative organizations as authorized by law." § 2301 (emphasis added). More significantly, however, the theme of voluntariness is carried through to the provisions of the Act that define those practices that are prohibited. Thus, in addition to forbidding various practices that could discourage producers from joining associations, the Act explicitly makes unlawful the coercion of a producer "in the exercise of his right . . . *to refrain from joining or belonging* to an association of producers," and the coercion of a producer to *"enter into [or] maintain* . . . a membership agreement or marketing contract with an association of producers." §§ 2303(a) and (c) (emphasis added). Moreover, by defining the term "handler" to include producers' associations as well as processors of agricultural products, see *supra,* at 464–465, the Act prohibits interference by the former to the same extent that it prohibits interference by the latter. In short, just as the Act forbids processors to interfere in a producer's decision to become or remain affiliated with an association, it also forbids an association of producers to interfere in that decision by coercing producers to belong to, or participate in a marketing contract with, the association.

## B

Congress' intent to shield producers from coercion by both processors and producers' associations is confirmed by the legislative history of the AFPA, which reveals that the question of the producer's free choice was a central focus of congressional attention during the passage of the Act. Although the AFPA began as a bill aimed solely at the threat of processor coercion, its orientation shifted as it progressed through Congress to one of sheltering the producer from coercion in either direction.

The bill originally introduced in the Senate, S. 109, 89th Cong., 1st Sess. (1965), did not explicitly protect the producer's right to remain independent from an association and for that reason provoked considerable criticism in the hearings that followed. Critics of the bill offered several reasons for

prohibiting association coercion to the same extent as processor coercion. First, some producers stated that they preferred to remain independent because they believed they could earn more money if they marketed their products themselves.[11] Second, processors testified that unless associations were also prohibited from pressuring producers, there would be a serious risk that the associations would attain a bargaining position of monopoly proportion, to the detriment of not only the processor, but the consumer as well.[12] Third, witnesses testified that a prohibition on interference by producers' associations would promote competition on the merits among associations seeking membership.[13] Fourth, many handlers testified that they would be disadvantaged in the quality of the product they could buy as well as the price they would have to pay if producers' associations were permitted substantially to diminish the ranks of the independent producer.[14] Finally, witnesses testified that the producer's right to remain independent of an association was simply "a basic American right" deserving of protection.[15]

---

[11] See, e. g., Agricultural Producers Marketing Act: Hearings on S. 109 before a Subcommittee of the Senate Committee on Agriculture and Forestry, 90th Cong., 1st Sess., 144 (statement of Earl W. Kintner, National Tax Equality Association), 173–183 (statement of Paul L. Phillips) (1967) (hereinafter cited as 1967 Senate Hearings).

[12] See, e. g., Discrimination Against Members of Farmer Cooperatives: Hearings on S. 109 before the Subcommittee of the Senate Committee on Agriculture and Forestry, 89th Cong., 2d Sess., 135 (1966) (statement of A. Starke Taylor Jr., Independent Cotton Industries Association) (hereinafter cited as 1966 Senate Hearings); 1967 Senate Hearings, at 110, 113–114 (statement of W. W. Holding III, American Cotton Shippers Association), 151 (statement of Earl W. Kintner, National Tax Equality Association), 196 (statement of Irving Isaacson, Maine Poultry Associates).

[13] See, e. g., 1966 Senate Hearings, at 187 (statement of Harry L. Graham, National Grange).

[14] See, e. g., 1967 Senate Hearings, at 69 (statement of Edward Brown Williams, National Association of Frozen Food Packers), 91–92 (statement of G. Ted Cameron, National Broiler Council).

[15] 1967 Senate Hearings, at 10–11 (statement of Sen. Williams). See, e. g., 1966 Senate Hearings, at 146 (statement of Donald G. Smith, Texas

In response to these concerns, the Senate passed an amended bill that prohibited coercion by both processors and associations, thereby protecting the producer's right to remain independent. The new bill opened with a legislative finding that "the marketing and bargaining position of individual farmers will be adversely affected unless they are free to join together *or not join together* in cooperative organizations as authorized by law." 113 Cong. Rec. 21410 (1967) (emphasis added). The bill went on to provide:

*"It shall be unlawful for any* handler or *association of producers* knowingly to engage . . . in the following practices:

"(a) *To coerce any producer in the exercise of his right* to join and belong to or *to refrain from joining or belonging to an association of producers* . . . ; or

.      .      .      .      .

"(c) To coerce or intimidate any producer or other person *to enter into [or] maintain* . . . a membership agreement or

---

Independent Ginners Association), 196–197 (statement of Edward Dunkelberger, National Canners Association).

In addition, much of the testimony focused on the case of vertically integrated producers' associations that process their members' products. As several witnesses explained, because such associations compete in the processing market, the one-sided orientation of the bill provided these associations with an unfair competitive advantage over other processors. Indeed, many of these processors feared that the bill would, for that reason, drive them entirely out of business. See, *e. g., id.,* at 135 (statement of A. Starke Taylor, Jr., Independent Cotton Industries Association), 138–140 (statement of Paul L. Courtney, National Association of Wholesalers); 1967 Senate Hearings, at 122–123 (statement of Herman Eubank, Texas Independent Ginners Association). The Michigan Act, however, effectively excludes vertically integrated associations from the accreditation process. In calculating the representational strength of an association seeking accreditation, the Michigan Act provides that "[t]he board shall exclude from [the total quantity of a commodity produced] any quantity of the agricultural commodity contracted by producers with producer owned and controlled processing cooperatives and any quantity produced by handlers." § 290.707(c). See n. 5, *supra.*

marketing contract with an association of producers or a contract with a handler . . . ." *Ibid.* (emphasis added).[16]

The Senate Report explaining these provisions of the bill stated:

> "The objective of the bill is to protect the producer in the exercise of a free choice. Many witnesses suggested that the bill did not fully accomplish this purpose, because it protected the producer only from improper pressure not to join an association. To protect his free choice he should also be protected from improper pressure in the other direction, that is, improper pressure to join an association. The committee did not have before it any testimony to indicate that producers were being subjected to any improper pressure to join associations, but was convinced by the logic of the situation that if the objective is to protect the producer and afford him a free choice, the bill should protect him from pressure in either direction." S. Rep. No. 474, 90th Cong., 1st Sess., 5 (1967).

Similarly, when Senator Aiken introduced the bill on the floor of the Senate, he stated that the bill "is designed to protect the agricultural producer's right to decide, free from improper pressures, whether or not he wishes to belong to a marketing or bargaining association." 113 Cong. Rec. 21411 (1967).

---

[16] § 4. Section 4(d), which addresses the provision of "inducements and rewards" to producers, applies only to those seeking to have a producer refuse or cease to belong to an association, an approach that was ultimately adopted in the AFPA. See 7 U. S. C. § 2303(d). The Senate Report explained that "[t]he association of producers should not be prohibited from offering inducements to producers to belong to an association, since it is quite proper for an association to pursue vigorously the voluntary organization of farmers in its attempt to secure a better bargaining position for farmers." S. Rep. No. 474, 90th Cong., 1st Sess., 6 (1967).

The Senate bill was next referred to the House Committee on Agriculture, *ibid.*, which heard testimony from producers' associations opposed to their inclusion in the prohibited-practices section of the bill.[17] The Committee rejected their plea, however, and declined to adopt a proposed amendment to the bill that would have limited its application to processors. H. R. Rep. No. 824, 90th Cong., 1st Sess., 4–5 (1967). Ultimately, the House deleted the explicit reference to associations of producers from the prohibited-practices section of the bill, 114 Cong. Rec. 7449 (1968), and it amended the legislative findings and declaration of policy to read: "the marketing and bargaining position of individual farmers will be adversely affected unless they are free to join together *voluntarily* in cooperative organizations as authorized by law." *Id.*, at 7469 (emphasis added).[18] In so doing, however, the House indicated that it did not intend to alter the substance of the bill. Representative Sisk explained:

> "Since the bill already makes clear that associations of producers are not excluded from the term 'handler,' the phrase ['association of producers' in the prohibited-practices section] is redundant and could be misconstrued as unfairly pointing the finger of accusation to associations of producers. This is not the intent; and while my amendments do not change the purpose or basic meaning of the bill, they make misinterpretation more difficult." *Id.*, at 7464.

---

[17] Agricultural Fair Trade Practices: Hearings on S. 109 before the House Committee on Agriculture, 90th Cong,. 1st Sess., 66–67 (statement of Harry L. Graham, National Grange), 79 (statement of Tony T. Dechant, National Farmers Union), 89–90 (statement of Robert N. Hampton, National Council of Farmer Cooperatives), 109–110 (statement of Ralph B. Bunje, California Canning Peach Association) (1967).

[18] The Senate bill had stated that "the marketing and bargaining position of individual farmers will be adversely affected unless they are free to join together *or not join together* in cooperative organizations as authorized by law." 113 Cong. Rec. 21410 (1967) (emphasis added).

Similarly, in reference to the proposed amendment, Representative Latta stated that "I want the record to clearly show that our farmers under the present language of this bill . . . have the right not to join these associations if they so choose." *Id.*, at 7449. In response to Representative Latta, Representative Poage, Chairman of the House Committee on Agriculture, stated:

> "It was clearly the opinion of the entire committee that there was not any intention or desire to give anybody the right to discriminate against anybody else because of his failure to join any of these associations.
>
> .        .        .        .        .
>
> "I cannot see that the amendments do anything more than to make the matter read a little differently and a little more satisfactorily, to certain groups, without changing in one iota, so far as I can see, the legal effect of the legislation.
>
> .        .        .        .        .
>
> "I do not think taking out the words in numerous places—'associations of producers'—will in anywise change the legal effect." *Id*, at 7449–7450.

Finally, highlighting its intent to prohibit coerced affiliation with associations, the House amended the definition of the term "handler" to include any association "contracting or negotiating contracts or other arrangements, written or oral, with *or on behalf of* producers or associations of producers." *Id.*, at 7465, 7469 (emphasis added).[19]

---

[19] Indeed, throughout the legislative debate on S. 109, an interest in protecting the producer from coercion by either processors or producers was frequently expressed. For example, Representative Poage, Chairman of the House Committee on Agriculture, stated:

"In the House we felt it could be just as offensive to have discrimination against producers because of their lack of membership as to have discrimination against them because of their membership. It was basically that we wanted to make this bill apply in both directions—to make of it a two-way street—to make of it a protector of the right of the producer to

The Senate agreed to the House amendments without debate. *Id.*, at 8419. Hence, in passing S. 109, both the House and the Senate unequivocally expressed an intent to prohibit producers' associations from coercing a producer to agree to membership or any other agency relationship that would impinge on the producer's independence. It would appear, therefore, that despite the fact that the Michigan Act and the AFPA share the goal of augmenting the producer's bargaining power, the Michigan Act nonetheless conflicts with the AFPA by establishing "accredited" associations that wield the power to coerce producers to sell their products according to terms established by the association and to force producers to pay a service fee for the privilege.

### C

The Michigan Supreme Court held that "[w]hile § 2303 makes it unlawful for a handler to coerce a producer to 'join or belong to' an association, it does not forbid a *state* from requiring exclusive representation of individual producers where a producer majority sees fit." 416 Mich., at 719, 332 N. W. 2d, at 139. The Michigan Act, however, empowers producers' associations to do precisely what the federal Act

---

determine for himself whether he cared to or did not care to become a member of a cooperative.

". . . We made of the original legislation a two-way proposal which would actually assure to any producer the right to belong or not to belong to a cooperative." 114 Cong. Rec. 7451 (1968).

Similarly, Representative May stated:

"There was no one on the committee, either in testimony or in our discussion, that in any way wanted to confuse anyone about the farmer's right not to join an organization when he did not wish to do so. Actually that is spelled out in the prohibited practices . . . of the bill . . . when we say: To coerce any producer in the exercise of his right to join and belong to or to refrain from joining or belonging to an association of producers." *Id.*, at 7450.

And Representative Latta stated that "the farmers of this Nation will still have the right . . . to say to an association, 'I do not want to join your association and you cannot force me into it.'" *Ibid.*

forbids them to do. Once an association reaches a certain size and receives its accreditation, it is authorized to bind non-members, without their consent, to the marketing contracts into which it enters with processors. In effect, therefore, an accredited association operating under the Michigan Act may coerce a producer to "enter into [or] maintain . . . a marketing contract with an association of producers or a contract with a handler"—a clear violation of § 2303(c).[20] In addition, although the Michigan Act does not compel a producer to join an association, it binds him to the association's marketing contracts, forces him to pay fees to the association, and precludes him from marketing his goods himself. See n. 6, *supra*. In practical effect, therefore, the Michigan Act imposes on the producer the same incidents of association membership with which Congress was concerned in enacting § 2303(a).

In conclusion, because the Michigan Act authorizes producers' associations to engage in conduct that the federal Act forbids, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S., at 67.[21] To that extent, therefore, the Michigan Act is pre-empted by the AFPA, and the judgment of the Supreme Court of Michigan is reversed.

*It is so ordered.*

---

[20] Appellees attempt to draw an analogy between this case and cases covered by the "state-action exemption" to the federal antitrust laws. Brief for Appellee Agricultural Marketing and Bargaining Board 26–36; Brief for Appellee MACMA 22–31. The state-action exemption, however, is based on an interpretation of the antitrust laws and therefore has no direct application here. See, *e. g.*, *Parker* v. *Brown*, 317 U. S. 341 (1943). Moreover, the Michigan Act does not provide for the type of active state involvement in the market that the state-action exemption would require even if it were applicable.

[21] Because the Michigan Act is cast in permissive rather than mandatory terms—an association *may*, but need not, act as exclusive bargaining representative—this is not a case in which it is impossible for an individual to comply with both state and federal law. See *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963).