NEWARK GARDENS, INC.,
Plaintiff–Appellant,

v.

MICHIGAN POTATO INDUSTRY COM-
MISSION, Defendant–Appellee.

No. 87–1351.

United States Court of Appeals,
Sixth Circuit.

Argued March 15, 1988.

Decided May 16, 1988.

Henry E. Sarnacki (argued), Mount Cle-
mens, Mich., for plaintiff-appellant.

Louis J. Caruso, Sol. Gen., David W. Sil-
ver, Asst. Atty. Gen. (argued), Lansing,
Mich., for defendant-appellee.

James A. White, Foster, Swift, Collins &
Coey, P.C., Lansing, Mich., amicus curiae,
for defendant-appellee.

Before JONES and GUY, Circuit
Judges, and CONTIE, Senior Circuit
Judge.

RALPH B. GUY, Jr., Circuit Judge:

The question presented in this case is
whether certain provisions of the Michigan
Potato Industry Commission Act (MPICA)
are in conflict with and, thus, preempted by
the federal Agricultural Fair Practices Act
(AFPA). Under the MPICA, producers and
shippers of potato products in Michigan are
required to pay an assessment to the Michi-
gan Potato Industry Commission (the Com-
mission) which uses the proceeds to pro-
mote Michigan potato products. Plaintiff,
Newark Gardens, Inc., is a family-owned
business engaged in potato farming in Mi-
chigan. Plaintiff filed suit in federal dis-
trict court against the Michigan Depart-
ment of Agriculture and the Commission
seeking declaratory and injunctive relief
and damages. Plaintiff claimed that the
mandatory assessments imposed under the
MPICA were in violation of the AFPA
which protects the rights of farmers to join
cooperative associations or to remain inde-
pendent, and provides further protection
against economic coercion by producer or
processor associations. The district court
below dismissed the claims against the Mi-
chigan Department of Agriculture, on elev-
enth amendment grounds. Subsequently,
the court granted summary judgment in
favor of the Commission, finding that the
imposition of the mandatory assessments
was not in contravention of the intent and
purposes of the AFPA. Plaintiff appeals
the dismissal of its claims against the Com-

mission. For the following reasons, we affirm the judgment of the district court.

## I.

### A.

In examining the central issue of preemption, we find guidance in a recent decision of the United States Supreme Court in which the Court was called upon to determine whether the AFPA preempted another Michigan agricultural act. *See Michigan Canners & Freezers Association v. Agricultural Marketing and Bargaining Board*, 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984) (*Michigan Canners*). In *Michigan Canners*, the Court found that the AFPA did not explicitly preempt state law, nor did it reflect an intent to occupy the entire field of agricultural-product marketing. 467 U.S. at 469, 104 S.Ct. at 2522. Therefore, the only question before the Court was whether preemption arose as a result of irreconcilable conflict between the state and federal laws. Likewise, the sole question before this court is whether the MPICA "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Michigan Canners*, 467 U.S. at 469, 104 S.Ct. at 2523 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). In the event of a conflict between the state and federal laws, the federal law must prevail by virtue of the supremacy clause contained in article VI, clause 2, of the United States Constitution. Nevertheless, in *Kelly v. Washington*, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3 (1937), the Supreme Court stated:

> The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so "direct and positive" that the two acts cannot "be reconciled or consistently stand together."

*Id.* at 10, 58 S.Ct. at 92 (citations omitted).

### B.

The MPICA was enacted by the Michigan legislature in 1970. Under section 2 of the MPICA, the Potato Industry Commission was established within the Michigan Department of Agriculture. Mich.Comp.Laws Ann. § 290.422(1). The Commission is comprised of fifteen voting members appointed by the governor; ten growers, two processors, two shippers, and one retailer. *Id.* Section 3 of the MPICA sets forth the powers and duties of the Commission:

> Sec. 3. (1) The commission shall foster, develop, and promote the potato industry through research, promotion, advertising, market expansion, development of new markets, education, and the development and dissemination of market and industry information. The commission may develop procedures and carry out any other activity necessary to accomplish the purposes of this act.
>
> (2) To accomplish its purpose, the commission shall collect, prepare, and disseminate information relating to all of the following:
>
> (a) The importance of potatoes in human nutrition.
>
> (b) The manner, method, and means used and technology employed in the production, transportation, marketing, processing, and grading of potatoes.
>
> (c) The laws of this state relating to the production, transportation, marketing, processing, and grading of potatoes, to insure a pure and wholesome product.
>
> (d) Factors affecting the potato industry, such as unbalanced production, effect of the weather, influence of consumer purchasing power, and price relative to the cost of other foods.
>
> (e) Branding, labeling, stenciling, sealing, or packaging potatoes to protect their identity.
>
> (f) Other information as may be necessary to promote increased consumption of potatoes, and a better understanding and more efficient cooperation between producers, dealers, and the consuming public.

Mich.Comp.Laws Ann. § 290.423(1), (2).

Section 4 imposes a mandatory assessment "on potatoes grown in the state" levied against growers and shippers in or-

der to finance the activities of the commission. Mich.Comp.Laws Ann. § 290.424. Sections 5 and 7 provide for the enforcement of the MPICA by the Department of Agriculture through the imposition of fines. Mich.Comp.Laws Ann. § 290.425, .427. Under section 6, a producer or shipper who fails to pay the mandatory assessment or who fails to comply with the financial reporting and disclosure requirements is guilty of a misdemeanor. Mich.Comp.Laws Ann. § 290.426.

### C.

Congress enacted the AFPA in 1968. In the declaration of policy set forth in section 2 of the AFPA, Congress stated in part:

> The efficient production and marketing of agricultural products by farmers and ranchers is of vital concern to their welfare and to the general economy of the Nation. Because agricultural products are produced by numerous individual farmers, the marketing and bargaining position of individual farmers will be adversely affected unless they are free to join together voluntarily in cooperative organizations as authorized by law. Interference with this right is contrary to the public interest and adversely affects the free and orderly flow of goods in interstate and foreign commerce.
>
> It is, therefore, declared to be the policy of Congress and the purpose of this chapter to establish standards of fair practices required of handlers in their dealings in agricultural products.

7 U.S.C. § 2301. In describing the general contours of the AFPA, the Supreme Court has stated:

Congress enacted the AFPA to rectify a perceived imbalance in bargaining position between producers and processors of such products. Although the Act's principal purpose is to protect individual producers from interference by processors when deciding whether to belong to a producers' association, the Act also protects the producer from coercion by associations of producers. The AFPA thus provides that it is unlawful for either a processor or a producers' association to engage in practices that interfere with a producer's freedom to choose whether to bring his products to market himself or to sell them through a producers' cooperative association.

*Michigan Canners,* 467 U.S. at 464, 104 S.Ct. at 2520.

Specifically, section 4 of the AFPA provides in part:

> It shall be unlawful for any *handler*[1] knowingly to engage or permit any employee or agent to engage in the following practices:
>
> (a) To coerce any producer in the exercise of his right to join and belong to or to refrain from joining or belonging to an *association of producers,*[2] or to refuse to deal with any producer because of the exercise of his right to join and belong to such an association; or
>
> . . . .
>
> (c) To coerce or intimidate any producer to enter into, maintain, breach, cancel, or terminate a membership agreement or marketing contract with an *association of producers* or a contract with a handler. . . .

---

1. The definitional section of the AFPA provides in part:

   (a) The term "handler" means any person engaged in the business or practice of (1) acquiring agricultural products from producers or associations of producers for processing or sale; or (2) grading, packaging, handling, storing, or processing agricultural products received from producers or associations of producers; or (3) contracting or negotiating contracts or other arrangements, written or oral, with or on behalf of producers or associations of producers with respect to the production or marketing of any agricultural product; or (4) acting as an agent or broker for a handler in the performance of any function or act specified in clause (1), (2), or (3) of this paragraph.
   7 U.S.C. § 2302(a).

2. Section 2302(c) provides:

   (c) The term "association of producers" means any association of producers of agricultural products engaged in marketing, bargaining, shipping, or processing as defined in section 1141j(a) of Title 12, or in section 291 of this title.

7 U.S.C. § 2303(a), (c) (emphasis added).[3]

## II.

Essentially, plaintiff argues that the Commission qualifies as a "handler" under 7 U.S.C. § 2302(a)(3) and therefore is subject to the prohibitions of the AFPA. Plaintiff further contends that the Commission is involved in "marketing" since it engages in generic advertising promoting the use of Michigan potato products. Thus, plaintiff concludes that the imposition of mandatory assessments is tantamount to coercing the plaintiff "to enter into" or "maintain ... a membership agreement or a marketing contract with an association of producers or a contract with a handler," in violation of 7 U.S.C. § 2303(c). In the alternative, plaintiff argues that the mandatory fees are the equivalent of forced membership in the association of producers represented by the Commission, thereby infringing its rights under 7 U.S.C. § 2303(a).

### A.

In support of its argument, plaintiff relies primarily on the Supreme Court's decision in *Michigan Canners & Freezers Association v. Agricultural Marketing and Bargaining Board,* 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984), wherein the Court held that the AFPA preempted certain provisions of the Michigan Agricultural Market and Bargaining Act (MAMBA), Mich. Comp. Laws Ann. § 290.701, *et seq.* Like the AFPA, the MAMBA was designed to encourage collective action among producers, and it contained many of the same prohibitions as the federal Act. The MAMBA, however, also created a state-administered system whereby producers' associations could be certified as exclusive bargaining agents for all producers of a particular commodity. Mich.Comp.Laws Ann. §§ 290.703, .707. Once an association of producers had received accreditation from the state board, the association could negotiate with processors to establish a price and terms of sale which then became binding on all Michigan producers of that commodity, regardless of whether the producers were members of the association or not. All the producers were also required to pay a service fee to the association. In *Michigan Canners,* an independent Michigan asparagus producer and an asparagus processors' association sued the accredited asparagus association claiming that the portion of the Michigan Act requiring mandatory service fees and mandatory adherence to an association-negotiated contract were preempted by the AFPA. The Supreme Court of Michigan rejected plaintiffs' claim finding that the AFPA only prohibited *processor* misconduct, whereas the Michigan Act regulated *producers'* activities. 416 Mich. 706, 332 N.W.2d 134 (1982).

In a unanimous opinion written by Justice Brennan, the United States Supreme Court reversed. First, the Court examined the language of the AFPA and found that the definition of "handler" included both processors and associations of producers. 467 U.S. at 471, 104 S.Ct. at 2524. *See also* 7 U.S.C. § 2302(a)(3). Thus, the Court stated:

> In short, just as the Act forbids processors to interfere in a producer's decision to become or remain affiliated with an association, it also forbids an association of producers to interfere in that decision by coercing producers to belong to, or participate in a marketing contract with, the association.

467 U.S. at 471, 104 S.Ct. at 2524.

The Court also analyzed the legislative history of the AFPA. Initially, the bill was

---

**3.** Other prohibited practices include:

  (b) To discriminate against any producer with respect to price, quantity, quality, or other terms of purchase, acquisition, or other handling of agricultural products because of his membership in or contract with an association of producers; or

  ....

  (d) To pay or loan money, give any thing of value, or offer any other inducement or reward to a producer for refusing to or ceasing to belong to an association of producers; or

  (e) To make false reports about the finances, management, or activities of associations of producers or handlers; or

  (f) To conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by this chapter.

7 U.S.C. § 2303(b), (d), (e), (f).

directed exclusively at preventing processors from using their economic leverage to discourage farmers from joining producer associations. The bill was subsequently amended, however, to protect farmers who wished to remain independent from coercion by *producer* associations which sought to force the farmers to join the associations.[4] Therefore, based on the text of the statute and the legislative history, the Court concluded that the Michigan Act "conflicts with the AFPA by establishing 'accredited' associations that wield the power to coerce producers to sell their products according to terms established by the association and to force producers to pay a service fee for the privilege." 461 U.S. at 477, 104 S.Ct. at 2527.

Finally, the Court held that the producer association was not exempt from the prohibitions of the AFPA even though it had received the state's imprimatur by obtaining accreditation from the state board. Thus, the Court concluded:

> Once an association reaches a certain size and receives its accreditation, it is authorized to bind non-members, without their consent, to the marketing contracts into which it enters with processors. In effect, therefore, an accredited association operating under the Michigan Act may coerce a producer to "enter into [or] maintain ... a marketing contract with an association of producers or a contract with a handler"—a clear violation of § 2303(c). In addition, although the Michigan Act does not compel a producer to join an association, it binds him to the association's marketing contracts, forces him to pay fees to the association, and

precludes him from marketing his goods himself. In practical effect, therefore, the Michigan Act imposes on the producer the same incidents of association membership with which Congress was concerned in enacting § 2303(a).

In conclusion, because the Michigan Act authorizes producers' associations to engage in conduct that the federal Act forbids, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. at 67, 61 S.Ct. at 404. To that extent, therefore, the Michigan Act is pre-empted by the AFPA, and the judgment of the Supreme Court of Michigan is reversed.

467 U.S. at 478, 104 S.Ct. at 2427 (footnotes omitted).

At first glance, there are many similarities between the case before the Supreme Court in *Michigan Canners* and the instant case. Both cases involve suits brought by Michigan agricultural producers alleging that a Michigan agricultural law was preempted by the federal AFPA. There are, however, several important factual distinctions which distinguish *Michigan Canners* from the instant case. First, the plaintiffs in *Michigan Canners* were challenging the MAMBA which allowed an ordinary producer association to become, in effect, a "super association" with exclusive bargaining authority for all producers of that commodity.[5] In contrast, the Michigan Potato Industry Commission is clearly not an "association of producers" in the traditional sense. Rather, it is a unit of the State Department of Agriculture and its

---

4. The Supreme Court quoted from the Senate Report explaining the provisions of the bill:

> "The objective of the bill is to protect the producer in the exercise of a free choice. Many witnesses suggested that the bill did not fully accomplish this purpose, because it protected the producer only from improper pressure not to join an association. To protect his free choice he should also be protected from improper pressure in the other direction, that is, improper pressure to join an association. The committee did not have before it any testimony to indicate that producers were being subjected to any improper pressure to join associations, but was convinced by the logic of the situation that if the objective is to

protect the producer and afford him a free choice, the bill should protect him from pressure in either direction." S.Rep. No. 474, 90th Cong., 1st Sess., 5 (1967), U.S.Code Cong. & Admin.News 1968, p. 1867.

467 U.S. at 474, 104 S.Ct. at 2525.

5. Under the provisions of the MAMBA, an association of producers qualified for accreditation by showing that the association's membership constituted more than 50% of the producers of a particular commodity, and its members' production accounted for more than 50% of the total production within the state. Mich.Comp.Laws Ann. § 290.707(c).

members are appointed by the governor. Although most of the members are producers, the Commission is also comprised of processors, shippers, and retailers.

Even assuming that the Commission could be characterized as a "handler" and, thus, subject to the prohibitions contained in 7 U.S.C. § 2303, the alleged violations of the specific provisions are less obvious in the instant case than they were in *Michigan Canners*. In *Michigan Canners*, the producers were required to abide by the terms of the marketing agreements established by the accredited associations and were required to pay fees to the association regardless of whether they were members or not. Thus, the Court concluded that "in practical effect ... the Michigan Act imposes on the producer the same incidents of association membership with which Congress was concerned in enacting § 2303(a)." 467 U.S. at 478, 104 S.Ct. at 2427. As we have previously noted, however, there is a significant difference between the organizational structure of the accredited association of producers in *Michigan Canners* and the Potato Industry Commission. We find that the payment of fees to a state agency whose members are appointed by the governor is not equivalent to the imposition of mandatory membership dues to an association of producers.

Another basis for distinction is found in the level of interference in the producers' affairs. In *Michigan Canners*, the accredited associations had the authority to bind non-members to the marketing contracts which the association negotiated with producers. The Court found this to be a "clear violation of § 2303(c)" because it coerced the producer to "enter into [or] maintain ... a marketing contract with an association of producers or a contract with a handler." 467 U.S. at 478, 104 S.Ct. at 2527 (quoting 7 U.S.C. § 2303(c)). In contrast, the Potato Commission does not attempt to dictate the price, terms, or timing of the sale of potatoes in Michigan. Potato producers are free to sell to whomever they choose at whatever price they negotiate.

Given the factual differences described above, we find that the Supreme Court's opinion in *Michigan Canners* is not controlling in the instant case. Moreover, upon further examination of the text of the statute and its legislative history, we find that the imposition of mandatory fees used to pay for the promotion of Michigan products does not conflict with the purpose and intent of Congress in enacting the AFPA.

### B.

Section 2303 prohibits any "handler" from engaging in certain practices. The term handler is defined in section 2302, which provides in part:

> (a) The term "handler" means any person engaged in the business or practice of ... (3) contracting or negotiating contracts or other arrangements, written or oral, with or on behalf of producers or associations of producers with respect to the production or marketing of any agricultural product....

7 U.S.C. § 2302(a).[6]

Plaintiff argues that the Potato Commission is a "handler" within the meaning of section 2302(a)(3) because it engages in the "marketing" of agricultural products. We disagree. The Commission collects mandatory assessments from producers to pay for generic advertising designed to promote the consumption of Michigan potato products. The Commission also disseminates information compiled by the United States Department of Agriculture.

Under the MPICA, the Potato Commission is directed to "foster, develop and promote the potato industry through ... the development and dissemination of market and industry information." Mich.Comp. Laws Ann. § 290.423(1). The Act further provides:

> (2) To accomplish its purpose, the commission shall collect, prepare and disseminate information relating to all of the following:
>
> ....

---

6. *See supra* note 1.

(b) The manner, method, and means used and technology employed in the production, transportation, *marketing*, processing and grading of potatoes.

Mich.Comp.Laws Ann. § 290.423(2)(b) (emphasis added).

Admittedly, the activities of the Commission could be characterized as falling within an expansive definition of the word "marketing"; nevertheless, we find that Congress did not intend that the AFPA should prohibit states from creating commodity boards for the limited purpose of promoting agricultural products grown within their states.

Plaintiff cites to portions of the legislative history of the AFPA which shows that Congress was concerned with preserving the freedom of farmers to choose whether or not to belong to an association of producers. The legislative history, however, does not contain any reference to the imposition of mandatory fees by state agencies for the purpose of promoting state products.

The definitional problem associated with the word "marketing" also arises in the context of the activities prohibited under sections 2303(a) and (c). Plaintiff alleges that it is being coerced into joining or belonging to an "association of producers" in violation of section 2303(a). Plaintiff further alleges that it is being coerced into maintaining a *"marketing* contract with an association of producers" in violation of section 2303(c). In order to determine whether the activities of the Potato Commission violate these provisions, we must consider whether the Commission is an "association of producers" within the meaning of the Act. We have already noted the differences between the traditional association of producers involved in *Michigan Canners* and the Potato Commission. We now consider whether the Commission fits within the statutory definition of the term "association of producers."

### C.

Title 7, United States Code, section 2302(c) provides:

The term "association of producers" means any association of producers of agricultural products engaged in *marketing*, bargaining, shipping, or processing as defined in section 1141j(a) of Title 12, or in section 291 of this title.

7 U.S.C. § 2302(c) (emphasis added).

The other acts incorporated by reference into section 2302(c) also use the term "marketing." Title 12, United States Code, section 1141j(a) provides in part:

As used in this subchapter, the term "cooperative association" means any association in which farmers act together in processing, preparing for market, handling, and/or marketing the farm products of persons so engaged, and also means any association in which farmers act together in purchasing, testing, grading, processing, distributing, and/or furnishing farm supplies and/or farm business services: *Provided, however,* That such associations are operated for the mutual benefit of the members thereof as such producers or purchasers....

The definition contained in 12 U.S.C. § 1141j(a) is part of the Agricultural Marketing Act of 1929 which was designed to "encourage the organization of producers into effective associations" and to "minimiz[e] speculation" and to prevent "inefficient and wasteful methods of distribution." *See* 12 U.S.C. § 1141.

Title 7, United States Code, section 291 provides:

Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: *Provided, however,* That such associations are operated for the mutual benefit of the members thereof....

This definition is part of the Capper–Volstead Act which exempts agricultural cooperatives from the antitrust laws.

The district court concluded that these definitional sections described traditional cooperatives among farmers and did not contemplate governmental commodity promotion boards such as the Potato Commission. In support of its interpretation of these provisions, the district court quoted at length from several law review articles which discussed federal legislation involving farm cooperatives.[7] The district court found that the Potato Commission was not within "the cooperative association tradition" because it did not engage in collective bargaining on behalf of farmers, nor did it perform any act which involved the sale or transfer of title in potatoes from grower to shipper to retailer to consumer. Therefore, since the Commission did not fit within the definitions contained in 7 U.S.C. § 291 or 12 U.S.C. § 1141j(a), the court reasoned that it was not an "association of producers" within the meaning of the AFPA as defined in 7 U.S.C. § 2302(c). We agree.

In support of its more expansive interpretation of the definition of "association of producers," plaintiff cites to the decision of the United States Court of Appeals for the Ninth Circuit in *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc.*, 497 F.2d 203 (9th Cir.), *cert. denied*, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed. 2d 273 (1974). Plaintiff quotes from the following excerpt from *Treasure Valley* wherein the court discusses the term "marketing" as found in 7 U.S.C. § 291 (Capper–Volstead Act):

> We think the term *marketing* is far broader than the word *sell*. A common definition of "marketing" is this: "The aggregate of functions involved in transferring title and in moving goods from producer to consumer, including *among others* buying, selling, storing, transporting, standardizing, financing, risk bearing, and *supplying market information*." Webster's New Collegiate Dictionary, 1953 Edition. [Emphasis added].

The associations here were engaged in bargaining for the sales to be made by their individual members. This necessarily requires supplying market information and performing other acts that are part of the aggregate of functions involved in the transferring of title to the potatoes. The associations were thus clearly performing "marketing" functions within the plain meaning of the term. We see no reason to give that word a special meaning within the context of the Capper–Volstead Act.

497 F.2d at 215. Plaintiff contends that the Potato Commission supplies "market information" and therefore engages in "marketing" as is defined in 7 U.S.C. § 2302(c).

A careful reading of *Treasure Valley* reveals that plaintiff's reliance on that case is misplaced. *Treasure Valley* involved an antitrust suit brought by farmers against two food processors alleging that the defendants had conspired to fix the price at which they would purchase potatoes from the farmers. The defendants counterclaimed alleging that the farmers had violated the antitrust laws by conspiring in restraint of trade by negotiating collectively through bargaining associations. The district court dismissed both the claims and the counterclaims. First, the district court ruled that the farmers had failed to produce sufficient evidence of price fixing on the part of the processors. With respect to the counterclaim, the court held that the farmers' bargaining associations were exempt from antitrust laws by virtue of the Capper–Volstead Act, 7 U.S.C. § 291.

On appeal, the processors argued that the bargaining associations were not exempt from the antitrust laws because they did not actually *sell* the potatoes. Rather, they simply represented the farmers in collective bargaining with the processors. The Ninth Circuit rejected this argument finding that the collective bargaining on behalf of the farmers constituted "market-

---

7. *See, e.g.,* Hawke, *Antitrust Implications of Agricultural Cooperatives,* 73 Ky.L.J. 1033 (1984); Center, *Retained Equities of Agricultural Cooper-* *atives and the Federal Securities Acts,* 31 U.Kan. L.Rev. 245 (1982).

ing" within the meaning of the Capper–Volstead Act and, therefore, the bargaining associations were immune from antitrust prosecution.

The collective bargaining activities of the associations which represented the farmers in *Treasure Valley* are clearly distinguishable from the activities of the Potato Commission in the instant case. These bargaining associations which negotiated with the processors on behalf of the farmers were within the traditional definition of cooperative associations. *See Treasure Valley*, 497 F.2d at 216 n. 10 and accompanying text. Thus, it is not surprising that the Ninth Circuit found that these associations fell within the Capper–Volstead exemption to the antitrust laws. The collective bargaining associations in *Treasure Valley* were similar in nature to the association involved in *Michigan Canners* with the exception that the *Treasure Valley* bargaining association did not attempt to bind non-members to the contracts they negotiated with the processors. Thus, *Treasure Valley* provides no more support for plaintiff's argument than does the Supreme Court's opinion in *Michigan Canners*.

### D.

Even if the activities of the Potato Commission arguably fit within the literal language of the prohibitions set forth in section 2303, we would still be compelled to conclude that these activities are not preempted by the federal law. When the AFPA is viewed in context of the overall scheme of federal agricultural legislation, it becomes abundantly clear that Congress had no intention of preventing state agencies from imposing mandatory assessments to finance generic commodity promotions. First, as previously noted, there is nothing in the legislative history to indicate that Congress was concerned with this issue. Second, section 6(d) of the AFPA specifically provides: "The provisions of this chapter shall not be construed to change or modify existing State law nor to deprive the proper State court of jurisdiction." 7 U.S.C. § 2305(d).

The MPICA, which created the Potato Commission, was not enacted until 1970, two years after the passage of the AFPA. There were, however, many other marketing and promotional acts in effect in various states (including several in Michigan) requiring growers to pay mandatory fees, assessments, or taxes to organizations similar to the Michigan Potato Industry Commission.

For example, the State of Idaho has a potato industry promotion program establishing a potato commission similar in character and scope to the Michigan Potato Industry Commission. Idaho Code § 22–1202. Since 1939, Idaho potato growers have had to pay a mandatory tax on the potatoes they sell. The tax goes to the "Idaho potato fund" and is spent by the Idaho Potato Commission on the marketing and promotion of Idaho potatoes. In its operation and purposes, the Idaho potato promotion program is no different than the Michigan potato promotion program under attack in this case.

Likewise, the State of Michigan has enacted both specific and generic agricultural product promotion legislation prior to the enactment of AFPA. *See, e.g.*, Michigan Bean Commission Act, Mich.Comp.Laws § 290.551, *et seq.*; and the Michigan Agricultural Commodities Marketing Act (MACMA), Mich.Comp.Laws § 290.651, *et seq.* Under the MACMA, several commodity groups, such as those in cherries and apples, have promulgated programs under which growers presently pay mandatory assessments to their respective promotional and marketing committees. All those programs were promulgated under acts already existing as state law prior to the passage of the AFPA.

Moreover, federal law explicitly permits mandatory agricultural assessments. The body of federal law most extensively involved in the marketing of agricultural products is the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601, *et seq.* (AMA Act of 1937). That Act authorizes marketing agreements and marketing orders in order to maintain orderly marketing conditions in interstate commerce for

agricultural commodities. Marketing agreements are formal, voluntary agreements between the Secretary of Agriculture and handlers of a particular commodity who have signed the agreement. The constitutionality of the AMA Act of 1937 was upheld in *United States v. Rock Royal Cooperative, Inc.*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939).

The extensive federal involvement in agricultural marketing is based upon a concern with the conditions surrounding entry of a product into the marketplace. The marketing agreements and orders affect the standards of agricultural products and the size of the crop. Federal marketing agreements and orders also involve advertising, research, promotion, publicity, and market development. Federal marketing orders require mandatory payment of assessments to help pay for expenditures to support advertising, research, and market development. The AMA Act of 1937 has spawned the establishment of formal marketing agreements and orders for a wide variety of agricultural products. *See generally* 7 C.F.R. §§ 900–999. For example, the "Raisin Administrative Committee" is empowered to impose an assessment on "handlers" which can then be used to promote the consumption of raisins grown in California. *See* 7 C.F.R. § 989.53(4). Similar programs exist for avocados grown in South Florida, 7 C.F.R. § 915; papayas grown in Hawaii, 7 C.F.R. § 928; and dozens of other products grown in several states. The existence of these federal agricultural marketing orders, featuring mandatory assessments used in part to finance generic advertising, market development, and research, demonstrate a Congressional awareness of such programs and nullifies any inference of an intent to outlaw such programs under the AFPA.

In sum, we find that the MPICA does not "stand as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress" in enacting the

AFPA. Accordingly, we find that the MPICA is not preempted by the AFPA.

AFFIRMED.